767 S.E.2d 157

ABBEVILLE COUNTY SCHOOL DISTRICT,
et al., Appellants–Respondents,

v.

The STATE of South Carolina, et al., of whom Hugh K. Leather-
man, Sr., as President Pro Tempore of the Senate and as a
representative of the South Carolina Senate and James H.
Lucas, as Speaker Pro Tempore of the House of Representa-
tives and as a representative of the South Carolina House of
Representatives are, Respondents–Appellants,

and

The State of South Carolina, Nikki R. Haley, as Governor
of the State of South Carolina, are, Respondents.

Appellate Case No. 2007–065159.

No. 27466.

Supreme Court of South Carolina.

Heard Sept. 18, 2012.

Decided Nov. 12, 2014.

Rehearing Denied Jan. 23, 2015.

620

Carl B. Epps, III, Stephen G. Morrison, and Elizabeth Scott Moise, and Rachel Atkin Hedley, all of Nelson Mullins Riley & Scarborough, LLP, of Columbia, and Laura Callaway Hart, of Duff, White, & Turner, LLC, of Columbia, for Appellants–Respondents.

Robert E. Stepp, Elizabeth Van Doren Gray, and Roland M. Franklin, Jr., all of Sowell Gray Stepp & Lafitte, LLC, of Columbia, for Respondents–Appellants. Attorney General Alan Wilson, Deputy Solicitor General J. Emory Smith, Jr., and Swati Shah Patel, all of Columbia, for Respondent.

Kenneth L. Childs, William F. Halligan and Keith R. Powell, all of Childs & Halligan, of Columbia, for Amicus Curiae, South Carolina Association of School Administrators and South Carolina School Boards Association.

W. Allen Nickles, III and Susan M. Fittipaldi, both of Nickles Law Firm, of Columbia, for Amicus Curiae, The South Carolina Education Association.

Amanda G. Adler and Sue Berkowitz, both of Columbia, of South Carolina Appleseed Legal Justice Center, for Amicus Curiae, The South Carolina Appleseed Legal Justice Center.

Matthew T. Richardson, of Wyche, Burgess, Freeman & Parham, P.A., of Columbia, and Ellen M. Boylan, of Education Law Center, of Newark, New Jersey, for Amicus Curiae, The League of Women Voters of South Carolina and the South Carolina State Conference of the National Association for the Advancement of Colored People.

Stephen K. Benjamin and Tina N. Herbert, of McAngus, Goudelock & Courie, of Columbia, for Amicus Curiae, South Carolina Association of School Administrators and South Carolina School Boards Association.

Edward W. Laney, IV and R. Hawthorne Barrett, both of Turner Padget Graham & Laney, P.A., of Columbia, for Amicus Curiae, South Carolina Association of School Nurses.

Chief Justice TOAL.

The South Carolina Constitution requires there be a system of free public schools that affords each student the opportunity to receive a minimally adequate education.[1] The plaintiffs, including eight South Carolina school districts, claim that the State has failed to meet this constitutional obligation. The trial court held that the State's failure to address the effects of pervasive poverty on students within the plaintiffs' school districts prevented those students from receiving the required opportunity. The trial court performed a thorough and cogent examination of the issues of this case. While we agree with the trial court's conclusion regarding the adverse effects of poverty, the Record demonstrates that there are myriad other issues, under the State's control, working to prevent students within these districts from receiving the constitutionally required opportunity. Thus, we find in favor of the plaintiffs, and affirm as modified.

## FACTUAL/PROCEDURAL BACKGROUND

The plaintiffs in this action are school districts, students, parents, and taxpayers (collectively, the Plaintiff Districts) individually and collectively challenging South Carolina's method of funding public schools.[2] The defendants include the State of South Carolina; Nikki R. Haley, as Governor of South Carolina; Hugh K. Leatherman, Sr., as President Pro Tempore of the South Carolina Senate, and as a representa-

---

1. *Abbeville Cnty. Sch. Dist. v. State*, 335 S.C. 58, 68, 515 S.E.2d 535, 540 (1999).

2. The eight school districts are as follows: Allendale County School District (Allendale); Dillon County School District 2 (Dillon 2); Florence County School District 4 (Florence 4); Hampton County School District 2 (Hampton 2); Jasper County School District (Jasper); Lee County School District (Lee); Marion County School District 7 (Marion 7); and Orangeburg County School District 3 (Orangeburg 3).

tive of the South Carolina Senate; and James H. Lucas, as Speaker Pro Tempore of the South Carolina House of Representatives and as a representative of the South Carolina House of Representatives (collectively, the Defendants).

## I. *Abbeville I*

In *Abbeville County School District v. State (Abbeville I)*, 335 S.C. 58, 515 S.E.2d 535 (1999), the Plaintiff Districts brought a declaratory judgment action challenging the Defendants' funding of public primary and secondary education. Specifically, the Plaintiff Districts claimed that South Carolina's education system was underfunded, resulting in a violation of the state constitution's education clause, and that to the extent the Defendants distributed funds without regard for school district wealth under the Education Improvement Act (EIA), the system violated the state and federal constitutional guarantees of equal protection. *Id.* at 64, 515 S.E.2d at 538. The Plaintiff Districts also asserted that the Education Finance Act (EFA) created a private cause of action. *Id.* (citing EIA, S.C.Code Ann. §§ 59–21–420 to –450 (1990 & Supp.1998); EFA, S.C.Code Ann. §§ 59–2010 to –80 (1990 & Supp.1998)). The Plaintiff Districts did not seek "equal" state funding, but instead alleged that the current funding scheme resulted in inadequate education. *Id.* The trial court dismissed the complaint for failure to state a claim. *Id.* at 63, 515 S.E.2d at 538. This Court reversed the trial court's ruling as to the state constitution's education clause, and affirmed as to the remaining issues. *Id.* at 64, 515 S.E.2d at 538.

Prior to hearing *Abbeville I*, this Court denied constitutional challenges to the EFA and EIA statutory distribution methods. *Richland Cnty. v. Campbell*, 294 S.C. 346, 349–50, 364 S.E.2d 470, 472 (1988). We relied on *Campbell*, and the United States Supreme Court's ruling in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), to deny the Plaintiff Districts' equal protection claims. *Abbeville I*, 335 S.C. at 64–65, 515 S.E.2d at 538; *see also Rodriguez*, 411 U.S. at 23, 93 S.Ct. 1278 ("The argument here is not that the children in districts having relatively low assessable property values are receiving no public education; rather, it is that they are receiving a poorer quality education than that available to children in

districts having more assessable wealth. Apart from the unsettled and disputed question whether the quality of education may be determined by the amount of money expended for it, a sufficient answer to appellees' argument is that, at least where wealth is involved, the Equal Protection Clause does not require absolute equality or precisely equal advantages." (footnotes omitted)). The *Abbeville I* Court also upheld the trial court's ruling that the EFA did not create a private cause of action. *Abbeville I*, 335 S.C. at 65, 515 S.E.2d at 539 (citing S.C.Code Ann. § 59–20–30 (1990 & Supp.1998); *Citizens for Lee Cnty. v. Lee Cnty.*, 308 S.C. 23, 29, 416 S.E.2d 641, 645 (1992)).

The most prominent issue in *Abbeville I* concerned Article XI, section 3 of the South Carolina Constitution, entitled "System of free public schools and other public institutions." *Id.* at 66, 515 S.E.2d at 539 (quoting S.C. Const. art. XI, § 3). That section of the constitution provides:

> The General Assembly shall provide for the maintenance and support of a system of free public schools open to all children in the state and shall establish, organize and support such other public institutions of learning as may be desirable.

S.C. Const. art. XI, § 3.

The trial court held that the section did not impose qualitative standards, and unless the Plaintiff Districts claimed that a universal system of free public schools did not exist, they could state no claim under the education clause. *Abbeville I*, 335 S.C. at 66, 515 S.E.2d at 539. This Court disagreed, and held that the South Carolina Constitution requires the General Assembly to "provide for the opportunity for each child to receive a minimally adequate education." *Id.* at 68, 515 S.E.2d at 540. The Court defined "minimally adequate" to include the provision of adequate and safe facilities in which students have the opportunity to acquire:

(1) The ability to read, write, and speak the English language, and knowledge of mathematics and physical science;

(2) A fundamental knowledge of economic, social, and political systems, and of history and governmental processes; and

(3) Academic and vocational skills.

*Id.* at 68–69, 515 S.E.2d at 540 ("We recognize that we are not experts in education, and we do not intend to dictate the programs utilized in our public schools. Instead we have defined, within deliberately broad parameters, the outlines of the constitution's requirement of minimally adequate education."). The Court found the complaint stated a claim of inadequate educational opportunity, and remanded for further proceedings. *Id.* at 69, 515 S.E.2d at 541.

## II. *Abbeville I* Remand

On remand, the trial court commenced a non-jury trial from July 18, 2003, until December 9, 2004. According to the trial court, this Court's decision in *Abbeville I* created a single issue on remand: "Are the students in the Plaintiff Districts being provided the opportunity to acquire a minimally adequate education in adequate and safe facilities as defined by the South Carolina Supreme Court?" The Plaintiff Districts employed a strategy which examined the resources available to the relevant school districts, also referred to as system "inputs," as well as the school districts' and their students' performances, referred to as system "outputs." The Plaintiff Districts argued that an analysis of the inputs placed into the school system, and the resulting outputs, proved that the State did not afford students in these districts an opportunity to receive a minimally adequate education. In opposition, the Defendants argued that the resources placed into the system provided the opportunity for students to obtain a minimally adequate education, and some students chose to take advantage of the opportunity, while others did not.

The trial court found that facilities in the Plaintiff Districts were safe and adequate. The trial court likewise found that South Carolina Curriculum Standards were sufficient, and that the State's system of teacher licensure ensured at least minimally competent teachers provided instruction consistent with these curriculum standards. The trial court determined that inputs into the educational system satisfied the constitutional requirement, except for the State's failure to fund early childhood intervention programs. According to the trial court:

The child born to poverty whose cognitive abilities have largely been formed by the age of six in a setting largely

devoid of printed word, the life blood of literacy, and other stabilizing influences necessary for normal development, is already behind, before he or she receives the first word of instruction in a formal educational setting. It is for this reason that early childhood intervention at the pre-kindergarten level and continuing through at least grade three is necessary to minimize, to the extent possible, the impact and the effect of poverty on the educational abilities and achievements of these children.

Thus, the trial court concluded that the Defendants did not meet the constitutional requirement as a result of their failure to adequately fund early childhood intervention programs.

The Plaintiff Districts appealed, and the Defendants cross-appealed. This Court heard oral arguments on June 25, 2008, and re-arguments on September 18, 2012.

## ISSUES PRESENTED

I. Whether this case is moot?

II. Whether the State's education system affords students in the Plaintiff Districts the opportunity for a minimally adequate education?

III. Whether the Court should become involved in the controversy?

IV. Whether the Court may fashion a remedy?

## STANDARD OF REVIEW

"[A]ll statutes are presumed constitutional and, if possible, will be construed to render them valid." *Curtis v. State*, 345 S.C. 557, 569, 549 S.E.2d 591, 597 (2001). Accordingly, we will not find a statute unconstitutional unless "its repugnance to the Constitution is clear beyond a reasonable doubt." *Id.* at 570, 549 S.E.2d at 597.

However, the Plaintiff Districts do not argue that the statutes comprising South Carolina's education regime in and of themselves are repugnant to the Constitution, or that the Defendants overstepped their authority in creating the regime. Instead, Plaintiff Districts argue, and we agree, that the proper question is whether the education funding apparatus as a whole gives rise to a constitutional violation.

■ We conclude the trial court, in utilizing a preponderance of the evidence standard, applied the correct burden of proof, and on appeal, we review the trial court's determinations as an action at law tried without a jury. In an action at law, on appeal of a case tried without a jury, the Court views the trial court's findings of fact as equivalent to a jury's findings in a law action, and will not disturb the findings unless the Court views the trial court's findings to be without reasonable evidentiary support. *Townes Assocs., Ltd. v. City of Greenville,* 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976). Thus, this Court's review generally extends merely to corrections of errors of law. *Moseley v. All Things Possible, Inc.,* 395 S.C. 492, 495, 719 S.E.2d 656, 658 (2011).

## LAW/ANALYSIS

### I. Mootness

■ Defendants argue this case is moot due to substantial changes to the relevant facts and law since the oral argument of this case. We disagree.

■■ An appellate court will not rule on moot and academic questions or make adjudication where there remains no actual controversy. *Jackson v. State,* 331 S.C. 486, 490 n. 2, 489 S.E.2d 915, 917 n. 2 (1997). "A case becomes moot when judgment, if rendered, will have no practical legal effect upon [the] existing controversy. This is true when some event occurs making it impossible for [the] reviewing Court to grant effectual relief." *Mathis v. S.C. State Highway Dep't,* 260 S.C. 344, 346, 195 S.E.2d 713, 715 (1973); *see also Curtis,* 345 S.C. at 567, 549 S.E.2d at 596.

■ An appellate court may take jurisdiction, despite mootness, if the issue raised is capable of repetition but evading review. *In re Care & Treatment of McCracken,* 346 S.C. 87, 90, 551 S.E.2d 235, 237 (2001); *Charleston Cnty. Sch. Dist. v. Charleston Cnty. Election Comm'n,* 336 S.C. 174, 180, 519 S.E.2d 567, 570–71 (1999). The Court may also make an exception to the mootness doctrine in order to decide questions of imperative urgency to establish a rule for future conduct in matters of important public interest. *Curtis,* 345 S.C. at 568, 549 S.E.2d at 596. Finally, if a decision by the

trial court may affect future events, or have collateral conse-
quences for the parties, an appeal from the decision is not
moot, even though the appellate court cannot give effective
relief in the case. *Id.*

The Plaintiff Districts contend that the case is not moot
because the inadequacies in the public education system that
gave rise to the constitutional violation persist today. The
Defendants counter that the only constitutional violation noted
by the trial court was the failure to fund early childhood
intervention programs, and in 2007, the General Assembly
created an early childhood intervention program in response
to the ruling. According to the Defendants, the General
Assembly continues to fund that program. The Defendants
also assert that the trial court's analysis concerned an edu-
cation system that has undergone substantial change, includ-
ing funding increases, testing changes, new facilities, district
mergers, charter schools, and new programs related to litera-
cy and nutrition.

We find the United States Supreme Court's decision in
*Northeastern Florida Chapter of Associated General Contrac-
tors v. City of Jacksonville* instructive. *See* 508 U.S. 656, 113
S.Ct. 2297, 124 L.Ed.2d 586 (1993). There, an association of
general contractors brought an action against the city of
Jacksonville challenging an ordinance according preferential
treatment to minority-owned businesses in the awarding of
city contracts. *Id.* at 658, 113 S.Ct. 2297. Twenty-two days
after the Supreme Court granted certiorari in the case, the
city repealed the ordinance and replaced it with a similar
ordinance which changed some of the provisions with which
the association took issue. *Id.* at 660, 113 S.Ct. 2297. The
city claimed the new ordinance rendered the case moot. *Id.* at
661, 113 S.Ct. 2297.

The Supreme Court rejected the notion that a defendant
could moot a case by repealing a challenged statute and
replacing it with one that differs in some "insignificant" re-
spect. *Id.* at 622, 113 S.Ct. 2297. Specifically, the Supreme
Court held that "the new ordinance may disadvantage [the
association] to a lesser degree than the old one, but ... it
disadvantages [the association] in the same fundamental way."
*Id.*

At the time of trial in the instant case, the EFA and the EIA provided the basis for South Carolina public school education funding. Since the first oral argument, the Defendants have made additional funding available through statute and proviso, and introduced new education programs. However, the Defendants have not substantially changed the baseline funding mechanisms. Thus, we find the Plaintiff Districts may validly argue that the overall funding scheme continues to disadvantage them in the same fundamental way. *See Ne. Fla. Chapter of Associated Gen. Contractors*, 508 U.S. at 662, 113 S.Ct. 2297.[3] Therefore we find that the instant case is not moot.[4]

## II. Minimally Adequate Education

We now turn to the substance of this matter: whether the trial court erred in finding that children in the Plaintiff Districts were denied the opportunity for a minimally adequate education in accordance with *Abbeville I.*

---

3. *See also Hussein v. State*, 81 A.D.3d 132, 137, 914 N.Y.S.2d 464 (N.Y.App.Div.2011) ("Although ... defendant may be able to demonstrate that the 2007 legislation will ameliorate the defects and discrepancies that plaintiffs allege exist, it is also possible ... that plaintiffs will demonstrate, based on available data, that even the planned increases in aid are not sufficient to enable the school districts to provide a constitutionally-guaranteed sound basic education."); *Coal. for Equitable Sch. Funding v. State*, 311 Or. 300, 811 P.2d 116, 117–18 (1991) (en banc) (holding the validity of a particular funding scheme was not the issue, but instead whether unequal funding deprived the plaintiffs of a constitutionally protected right); *Cox v. State*, 191 Or.App. 1, 80 P.3d 514, 515 (2003) (finding that the statute in effect during the trial of the case had been superseded by statute, and relying on *Coalition for Equitable School Funding*, 811 P.2d at 117–18, to reject the mootness claim); *Brigham v. State*, 179 Vt. 525, 889 A.2d 715, 722 (2005) ("As plaintiffs correctly point out, a change in law does not automatically moot a claim that is based on prior versions of the law.").

4. Even assuming *arguendo* that the instant controversy is moot, we may still properly exercise jurisdiction, as our decision provides necessary judicial guidance regarding whether the State's current educational program is sufficient to satisfy the Defendants' constitutional burden. *Cf. Sloan v. S.C. Dep't of Transp.*, 379 S.C. 160, 167–69, 666 S.E.2d 236, 240 (2008) (finding that a case challenging a construction project was not moot despite the project's completion because the Court's decision affected future events, such as how SCDOT authorized emergency procurements on future construction projects).

## A. Justiciability

As an initial matter, the dissent suggests that "the term 'minimally adequate education' is purposely ambiguous, objectively unknowable, and unworkable in a judicial setting," and that determining whether the Defendants are meeting their constitutional duty presents a non-justiciable political question. We respectfully disagree.

Courts may experience difficulty in determining the precise parameters of constitutionally acceptable behavior; however, this imprecision does not necessarily signify that courts cannot determine when a party's actions, or the results of those actions, fall outside the boundaries of such constitutional parameters. See, e.g., Miller v. California, 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (setting forth a three-part test to determine whether material is obscene and, thus, unprotected speech under the First Amendment, where the test relies in part on local and national standards of both art and indecency); Jacobellis v. Ohio, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring) (refusing to define obscenity, which "may be indefinable," but stating that "I know it when I see it").

More importantly, as Chief Justice John Marshall famously stated, "[I]t is emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. 137, 138, 1 Cranch 137, 2 L.Ed. 60 (1803). This hallowed observation is the bedrock of the judiciary's proper role in determining the constitutionality of laws, and the government's actions pursuant to those laws.[5]

Article XI, section 3 of the South Carolina Constitution mandates the General Assembly to "provide for the mainte-

---

5. See, e.g., Segars–Andrews v. Jud. Merit Selection Comm'n, 387 S.C. 109, 122–23, 691 S.E.2d 453, 460 (2010) ("Indeed, this Court is duty bound to review the actions of the Legislature when it is alleged in a properly filed suit that such actions are unconstitutional."); S.C. Pub. Interest Found. v. Jud. Merit Selection Comm'n, 369 S.C. 139, 142, 632 S.E.2d 277, 278 (2006) ("Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution." (quoting Baker v. Carr, 369 U.S. 186, 210–11, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962))).

nance and support of a system of free public schools open to all children in the state." Nothing in the text of the article precludes the judiciary from exercising its authority over the article's provisions, or intervening when the Defendants' laudable educational goals fall short of their constitutional duty. While the remedy in this case may affect future policy decisions regarding the State's education system, we disagree with the dissent that this controversy is non-justiciable. Rather, interpretation of the law—and evaluation of the government's acts pursuant to that law—are critical and necessary judicial functions. As such, we find that judicial intervention is both appropriate and necessary in this instance.[6]

### B. Factual Overview

 As a brief background, three of the Plaintiff Districts—Allendale, Jasper, and Lee—are county-wide school districts, and the remaining five Plaintiff Districts are located within counties with multiple school districts. Each school district is largely rural and employs its own administrative staff, including a superintendent. The Plaintiff Districts each serve several hundred to several thousand students. In each district, a high percentage of the students qualify for free and reduced lunch under the federal guidelines, which is considered a reliable indicator of the percentage of students living in poverty.

The trial court correctly found that to answer the question of whether each child in the Plaintiff Districts had the oppor-

---

6. Further, the dissent argues that because education is "constantly evolving," our state's education laws are insulated from judicial review. We profoundly disagree with the sentiment that because an area of law is constantly evolving, that area of law is somehow insulated from judicial review. For example, from the concise thirty-three words that comprise the Fourth Amendment to the United States Constitution, our nation's courts have developed a body of law recognizing the public's rights against law enforcement officers in a myriad of contexts. Despite the Fourth Amendment's explicit mention of "probable cause," courts readily recognize Terry stops supported instead by "reasonable suspicion" (as well as the subtle nuances of the boundaries and limitations of such stops), and have even applied the Fourth Amendment to GPS monitoring of vehicles, the technology of which would have been alien to the country's founding fathers. As such, the constant evolution of a particular area of law cannot serve as an indicator as to whether a controversy is justiciable.

tunity to acquire a minimally adequate education, it was necessary to determine how to measure the presence or absence of that opportunity. According to the trial court, much of the evidence in this case could be grouped into two categories: (1) inputs (the instrumentalities of learning and resources provided to the Plaintiff Districts, including money, curriculum, teachers, and programming); and (2) outputs (the success of students within the Plaintiff Districts as demonstrated primarily by test scores and graduation rates).

The Plaintiff Districts contend that the Defendants provided insufficient inputs to educate students in their districts. In support of this contention, the Plaintiff Districts pointed to certain outputs as evidence that the State failed to offer the constitutionally mandated opportunity. In our view, there is a clear disconnect between the inputs and outputs of the education system.

### B. Inputs

The EFA establishes the basic state funding scheme for all districts in South Carolina. This funding is generally referred to as the "foundation program." *See* S.C.Code Ann. § 59–20–20(1) (2004). In 1977, South Carolina enacted the EFA as part of an overall effort to address and ameliorate the problem of disparities in property wealth and the financing of public schools. The purpose of the EFA is:

(1) To guarantee to each student in the public schools of South Carolina the availability of at least minimum educational programs and services . . . ;

(2) To encourage school district initiative in seeking more effective and efficient means of achieving the goals of various programs;

(3) To establish a procedure for the distribution of a specified portion of the state education funds so as to ensure that the funds are provided on the basis of need . . . ;

(4) To make it possible for each school district to provide the defined minimum program . . . , and to do so with equal local tax effort;

(5) To establish a reasonable balance between the portion of the funds to be paid by the State and the portion of the

funds to be paid by the districts collectively in support of the education foundation program . . . ;

(6) To require each local school district to contribute its fair share to the required local effort, which is to be in direct proportion to its relative taxpaying ability; [and]

(7) To ensure that tax dollars spent in public schools are utilized effectively and to ensure that adequate programs serve all children of the State.

*Id.* § 59–20–30 (2004 & Supp.2013).

The EFA's foundation program is rooted in the defined minimum program (DMP), and the base student cost (BSC). The DMP is the program necessary to provide public school students with the minimum educational programs designed to meet their needs. *Id.* § 59–20–20(4). The BSC is the funding level necessary for providing the minimum foundation program, including the funding necessary for supporting the DMP and other school district needs as funds are available. *Id.* § 59–20–20(6). Essentially, the BSC represents the annual cost, determined by the State, necessary to fund a single public school education.

The EFA relies on "weightings" to account for the cost differences between programs developed for different students. *Id.* § 59–20–40(1)(c) (2004 & Supp.2013). This approach is designed to allow for the equitable distribution of funding based on pupil needs. *Id.*

Section 59–20–40 contains a computation scheme which determines what percentage of the cost for educational programs the State will provide, and what percentage of the cost will be provided by the district. *Id.* § 59–20–40(1)(e)–(f). The school district's contribution fluctuates based on the availability of local revenue and the district's taxpaying ability. *Id.* § 59–20–40(1)(e). At the time of trial, many of the Plaintiff Districts relied heavily on State-provided funding, receiving as high as 86% of the total costs for educational programs from the State.[7] In comparison, other non-Plaintiff Districts received

7. For example, Allendale received 80% of the necessary funds from the State; Florence 4 received 83%; Dillon 2 received 84%; and Hampton 2 received 86%.

significantly less support from the State, relying more heavily on local funding.[8]

In 1984, the General Assembly enacted the EIA, which in its current form: (1) raises the academic requirements for a high school diploma; (2) requires almost all schools to offer a college preparatory curriculum; (3) imposes a minimum instruction time of six hours per school day; (4) establishes kindergarten programs for five-year-olds; (5) provides funding for compensatory and remedial programs for failing students; (6) sets minimum academic standards for participation in interscholastic activities; (7) establishes teacher incentive programs to provide additional compensation for good teachers; and (8) implements measures to attract and retain better principals. The EIA also raised the sales tax from 4% to 5% to generate additional revenue to fund education, which is distributed for categorical programs without regard to a school district's tax base. *See* S.C.Code Ann. § 1236–2620 (2014); S.C.Code Ann. §§ 59–21–420, –1010(A)–(B) (2004).

In 1993, the General Assembly enacted the Early Childhood Development and Academic Assistance Act, commonly known as Act 135. *See* S.C.Code Ann. §§ 59–139–05 to –90 (2004). Act 135 provides for kindergarten through third grade programs, and provides academic assistance for students in all grade levels. *See id.* § 59–139–10. Act 135 assigns pupil weights in addition to those assigned by the EFA, including a poverty metric tied to the percentage of students on free and reduced lunch. *Id.* § 59–139–20. The Plaintiff Districts contain high percentages of students on free and reduced lunch, and therefore receive more per-pupil funding than those districts with fewer students taking part in these meal programs.

In 1994, the General Assembly passed the South Carolina School–to–Work Transition Act (the Transition Act) to facilitate a school-to-work transition for the more-than-half of South Carolina high school students that did not matriculate to college but instead sought to enter the job market. *Id.* §§ 59–52–20 to –150 (2004), *repealed by* Act No. 88, 2005 S.C. Acts 588, 601; *see also id.* §§ 59–59–10 to –250 (2014) (provid-

---

8. For example, York 2 received only 16% of the necessary funds from the State; Beaufort received 23%; Oconee received 51%; and Spartanburg 5 received 58%.

ing for similar programs within the new South Carolina Education and Economic Development Act). The Transition Act required the South Carolina Department of Education (the Department of Education) to establish a mechanism to prepare students for employment by creating regulations for career exploration, integrating career counseling activities into curriculums, and providing structured work-based opportunities, including a youth apprenticeship program. *Id.* § 59–5240(C).

In 1997, the General Assembly enacted the Educator Improvement Act (the Educator Act). S.C.Code Ann. §§ 59–26–10 to –100 (2004 & Supp.2013). In doing so, the General Assembly sought to provide for a "fair, cohesive, and comprehensive system for the training, certification, initial employment, evaluation, and continuous professional development of public educators." *Id.* § 59–26–10. The Educator Act directed the Department of Education to adopt nationally recognized training and teaching examinations for teachers, and to adopt procedures for robust regulation of the teaching profession. *Id.* § 59–26–20(a)–(e).

In 1998, the General Assembly enacted the Education Accountability Act (the EAA), directing the Department of Education to adopt grade-specific, performance-oriented educational standards for kindergarten through twelfth grades in the core academic areas of mathematics, English/language arts, social studies, and science. *Id.* § 59–18–300 (2004 & Supp.2013). The EAA required the State's Education Oversight Committee and the Department of Education to adopt a state-wide assessment to measure student performance, and establish annual report cards on the performance of public schools. *Id.* § 59–18–900(A) (2004 & Supp.2013). The report cards have five academic performance ratings of Excellent, Good, Average, Below Average, and Unsatisfactory. *Id.* § 59–18900(B).[9] These report cards are designed to inform parents

---

9. At the time of trial, the General Assembly utilized the academic performance rating "Unsatisfactory." *See* S.C.Code Ann. § 59–18–900(B) (2004). However, the General Assembly has since renamed this rating "At-Risk." *Id.* § 59–18–900(B) (Supp.2013). Because the name of the rating at the time of the trial was "Unsatisfactory," where applicable, we continue to use that term to describe the Plaintiff Districts' report card ratings, despite the change in nomenclature.

and the public of the school's performance, assist in addressing the strengths and weaknesses of a particular school, recognize schools with high performance, focus resources on schools with low performance, and meet federal report card requirements. *Id.* at § 59–18–900(A)(1)–(5). The EAA provides technical assistance for schools and districts in which large numbers of students perform below expectations on statewide testing, and for those school districts that receive a rating of Below Average or Unsatisfactory on their report card. *See id.* § 59–18–1500 to –1600 (2004 & Supp.2013).

The preceding enactments are indicative of a comprehensive education regime. The Defendants have seemingly addressed each of the important aspects of public school education, and provided the requisite funding for general education and additional programs. There is statutorily mandated funding for early childhood assistance, and transition programs for those students who choose to proceed directly from school to work. South Carolina's school teachers are held to nationally recognized certification and professional development standards, and the State's school districts are held accountable to the public through annual assessment and reporting.

Further, officials from each of the Plaintiff Districts testified at trial that teachers in their schools taught the curriculum standards in their classrooms and offered standard academic courses as mandated by state regulations. In addition, monetary inputs into each of the Plaintiff Districts appeared to fulfill the General Assembly's constitutional duty. For example, seven of the eight Plaintiff Districts' per-pupil expenditures exceeded the state average at the time of trial, and all eight districts received a significant increase in state funding between 1999 and 2002.[10]

Thus, a robust educational scheme appears to be at work in the Plaintiff Districts. The instrumentalities of learning—funding, curriculum, teachers, and programs—are present and appear at the very least minimally adequate.[11]

---

10. As described further, *infra*, the General Assembly has reduced funding for these programs since the time of trial.

11. According to the dissent, the inputs described, *supra*, can simply be boiled down to "money." We concede, simplistically, that these statutory enactments depend on money to successfully effectuate the Defen-

## D. Outputs

The Plaintiff Districts argue that the inputs, *supra,* do not provide their students with the constitutionally required opportunity because the inputs do not translate to outputs, and that therefore the expansive nature of South Carolina's public education architecture belies the serious problems in the Plaintiff Districts.

We agree that the Plaintiff Districts' outputs—measured in both district and student achievements, including student test scores—are troubling. While we acknowledge that the Defendants enacted a robust education scheme designed to address the critical aspects of public education, student performance in the Plaintiff Districts demonstrates an apparent disconnect between intentions and performance. The Record in this case helps define the contours of that disconnect.

### 1. Annual Report Cards

Every public school district in South Carolina receives a yearly report card, entitled the "South Carolina Annual District Report Card." [12] The districts are measured against the 2020 South Carolina Performance Vision (the 2020 Vision). The 2020 Vision outlines broad themes, goals, and strategies designed to be implemented at the local level to provide accountability and improvement within the state's education system.

The Department of Education rates districts as Excellent, Good, Average, Below Average, or Unsatisfactory. [13] The

---

dant's stated goals. However, the dissent's notion that the importance of school-to-work, teacher quality and certification, and early education programs are merely about "money" is the embodiment of the parties' underlying failure in this case, and demonstrates misapprehension of this case's key issues.

**12.** Each district's report card is publicly available and contains a district profile, as well as a message from the district superintendent. *See Report Cards,* S.C. State Dep't of Educ., https://ed.sc.gov/data/report-cards/ (last updated Apr. 16, 2014).

**13.** An Excellent rating means that the school district performance substantially exceeds the standards for progress toward the 2020 Vision. School districts rated Good exceed those standards. An Average school district meets the 2020 Vision standards, and a Below Average

school district report cards assess student performance on (1) the Palmetto Achievement Challenge Test (PACT) until 2008, or the Palmetto Assessment of State Standards (PASS), beginning in 2009; (2) the High School Assessment Program (HSAP), which all students must pass to graduate; and (3) the National Assessment of Educational Progress (NEAP).

The annual report cards for the Plaintiff Districts indicate that students in these districts attend schools largely unprepared to meet state standards for progress. For example, from 2007–11, not one of the Plaintiff Districts received anything above an Average rating. Specifically, five of the Plaintiff Districts—Allendale, Dillon 2, Hampton 2, Jasper, and Lee—failed to meet the standards of the 2020 Vision by consistently receiving either Below Average or Unsatisfactory ratings. The remaining three Plaintiff Districts—Florence 4, Marion 7, and Orangeburg 3—simply met the 2020 Vision standards by receiving Average ratings in 2011; however, only Orangeburg 3 sustained this performance for more than one year, as Florence 4 and Marion 7 received consistent Below Average or Unsatisfactory ratings in the years prior to 2011.

The most recent report cards from 2013 show minimal change. Five of the Plaintiff Districts (although not the same five) received either Below Average or Unsatisfactory ratings, whereas the remaining three districts achieved an Average rating. The evidence at trial established that, while the Plaintiff Districts are capable of improvement, the institutions within these districts are largely unfit to provide students with the constitutionally mandated opportunity.

### 2. Student Test Scores

At the time of trial, the PACT served as the State's method of assessing student achievement. First utilized in 1999, the PACT measured each student's grade-level knowledge in language arts, math, science, and social studies, categorizing a student's performance as Advanced, Proficient, Basic, or Below Basic.[14] A score of Proficient indicated the student was

---

school district is "in jeopardy" of not meeting those standards. A school district rated Unsatisfactory has failed to meet the 2020 Vision standards.

**14.** *News Archive,* S.C. State Dep't of Educ. (Apr. 24, 2001), https://ed.sc. gov/agency/news/?nid=33.

working at grade level and was sufficiently prepared for work at the next grade level; however, a score of Basic was sufficient to pass a student to the next grade level.

According to the trial evidence, the students' PACT scores in the Plaintiff Districts were consistently, alarmingly low. In most of the districts, the students' passage rates ranged between 36% and 50%, and only one district (Orangeburg 3) demonstrated a passage rate over 60%. Thus, excluding Orangeburg 3, at least half of the students at the Plaintiff Districts could not perform academic work at even a minimum level, and were not prepared to move to the next grade. As stated, *supra*, the Plaintiff Districts' report cards unsurprisingly reflected the low passage rates, with most districts receiving either Below Average or Unsatisfactory ratings.

Sadly, the passage of time has had virtually no effect on the low student achievement rates. In 2009, the PASS replaced the PACT. Instead of testing students based on Advanced, Proficient, Basic, and Below Basic, the PASS measures student achievement based on Exemplary, Met, and Not Met. According to data supplied by the Plaintiff Districts, and uncontroverted by the Defendants, students in the Plaintiff Districts have performed no better on statewide standardized testing since 2005. For example, in Allendale and Dillon 2 in 2010, the failure rates continued to hover around 50%. An overall comparison of test results from 2001 and 2010 in the Plaintiff Districts demonstrates a general decline in student performance, moderated by minimal and irregular gains.

According to the Defendants, nominal passage rates on the standardized tests indicate the presence of an opportunity to obtain a minimally adequate education, and low test scores are not an accurate indicator of the existence of a constitutional violation. While we agree with the Defendants that test scores alone do not demonstrate a violation, we cannot completely ignore a substantive measure of student performance in assessing whether the inputs afford the students their mandated opportunity.

### 3. Graduation Rates

Graduation rates appear to be one area in which the Plaintiff Districts demonstrated improvement since trial. In 2001,

South Carolina students graduated at a rate of 48%. The data available for seven of the Plaintiff Districts demonstrates that only students in Florence 4 graduated at a higher rate, 50%. Of the remaining six Plaintiff Districts, the graduation rates ranged between 26% and 41 %, well below the state average.

However, the most recent graduation rates for the Plaintiff Districts show dramatic improvement. In 2012, the most recent year for which national statistics are available, the United States Department of Education reported that South Carolina's high school graduation rate stands at 75%.[15] In 2013, the most recent year for which individual school district statistics are available, the Plaintiff Districts' graduation rates ranged between 68.5% and 79.6%, with five of the districts exceeding the 75% state average.

It appears that the Plaintiff Districts have made significant gains in line with the overall state-wide increase in graduation rates. Thus, while key indicators demonstrate that many aspects of the Plaintiff Districts' academic program are deficient, these shortcomings and inadequacies do not prevent students from "completing" their education and receiving a high school diploma.

### E. Other Factors

### 1. Transportation

School children without access to adequate transportation cannot obtain the constitutionally required opportunity. Section 59–20–20 of the South Carolina Code provides that transportation to and from the State's public schools may be paid for through state, local, or federal funds, or a combination thereof. S.C.Code Ann. § 59–20–20(2) (defining the terms of the EFA). However, the Defendants have taken advantage of the statutory language by placing the burden of funding transportation costs on districts that can little afford such a responsibility.

---

**15.** U.S. Dep't of Educ., *Public High School Four–Year On–Time Graduation Rates and Event Dropout Rates: School Years 2010–11 and 2011–12*, Nat'l Ctr. for Educ. Statistics, 10 (Apr.2014), http://nces.ed.gov/pubs2014/2014391.pdf.

At trial, the Plaintiff Districts established that large portions of school district budgets are spent on transportation costs, and according to the trial court, "[a] greater cost is borne by the children who have to spend far too much time riding to and from school, time that is largely wasted, since it cannot be devoted to any useful endeavor." The trial court also observed that the transition from smaller schools to larger consolidated schools—serving entire counties at times—has exacerbated the transportation burden on both local districts and the State. This consolidation has led to increases in the length of bus routes, the number of students transported, fuel costs, and bus maintenance. These issues have a palpable effect on students.

For example, the Plaintiff Districts presented evidence that, at the time of trial, students in Marion 7 routinely arrived as much as an hour late for school each morning due to an inadequate bussing system. After school officials provided these students with the opportunity for breakfast, valuable hours had been lost from the school day. In addition, these same children regularly spent between one to two hours waiting for school buses to take them home at the close of the school day. Marion 7's superintendent testified that some elementary school students spent as much as four hours per day on a school bus. In the words of the superintendent:

> They are worn out before they get there. And then two hours on the trip home. That's a long time for a first, second, third grader to be on a bus. . . . The second issue is our state has not done a good job of maintaining our bus system. Our buses often [ ] are old, they break down . . . in the mornings, [ ] or they don't crank, therefore the students come to school late. When they come late they miss instructional time, your [sic] missing an opportunity to learn [because] they are beside the road freezing or getting wet or doing something like that.

When asked why the school district did not merely replace the aging buses, the superintendent responded, "That's a [S]tate responsibility. The [S]tate purchases the school buses and in no way do we have the funds to buy extra school buses and pay for the gas and pay for the extra drivers in [Marion 7]."

At trial, Jasper's superintendent described the average school day for a five year old student in the district:

Q: If I'm a five year old student and I'm on one of these buses, what type of day might I experience in going to and from school? How much time would I spend on the buses?

A: Students catch the bus around 6:00 ... maybe a little earlier ... 5:45. They spend two hours on the bus, arrive at school, spend six and a half, seven hours there.... So they leave at six in the morning and get back at six in the evening.

According to the superintendent's testimony, six-year-old through eighteen-year-old students could "very easily" have a twelve hour school day, with four of these hours spent just traveling to and from school.

Additionally, the principal of Lee Central High School testified that bussing issues prevented students from taking advantage of academic programs. For example, students who would benefit from taking part in after-school homework centers needed transportation following the program's conclusion. However, the district could not afford the extra buses to transport one portion of the students at the end of the school day, and another portion following extra-instruction time. Thus, a significant portion of Lee's students could not take advantage of needed academic assistance.

While the trial court did not believe the "necessary" shifting to the Plaintiff Districts of some costs of student transportation rose to the level of a constitutional violation, it found that this shifting resulted in an adverse impact on the students' ability to learn. As a matter of ordinary course, students in the Plaintiff Districts arrived late both to school and home, preventing them from taking advantage of the full range of academic opportunities provided by the Plaintiff Districts. This "necessary" shifting surely contributes to a constitutional violation.

### 2. Teacher Quality

The trial court concluded that the relationship between student achievement and teacher characteristics is "minimal," and that the evidence did not support a finding that abysmal

achievement by students in the Plaintiff Districts—referred to by the trial court as "relatively lower"—correlated to the "relatively lower levels" of certain positive teacher characteristics. The trial court appeared to rely on one witness's comment that "what you do is more than who you are." Our review of the Record in this case proves this conclusion to be largely erroneous.

According to evidence presented at trial, approximately 81.4% of teachers in districts outside the Plaintiff Districts held continuing contracts. A teacher holding a continuing contract has passed the Praxis examination (the Praxis), a teacher-qualifying examination; taught for three years; and successfully completed a formal evaluation process. These teachers possess both minimal competency and teaching experience. Only 62.2% of teachers in the Plaintiff Districts qualified for these contracts. The remaining percentage consisted of a combination of teachers holding substandard certification, teachers with no certification, and teachers from outside South Carolina who are not required to pass the Praxis.

Teacher certification is an assessment of a teacher's general preparation and licensing. In South Carolina, a teacher must pass the Praxis to obtain full certification. In 2004, 15.1 % of teachers in South Carolina failed the Praxis. However, 29.3% of teachers in the Plaintiff Districts failed the examination, a failure rate almost twice as high as the state average.

Substandard certification is available to teachers unable to demonstrate the necessary competence or training for full certification. Substandard certifications include out-of-state, temporary, transitional, and interim certifications. These teachers generally lack the content knowledge of a certified teacher. At the time of trial, approximately 38.3% of substandard certificate holders previously failed the Praxis.[16] Although the Plaintiff Districts employed approximately 2.8% of all teachers statewide, 11.4% of substandard certificates were issued to teachers in those districts. Thus, the Plaintiff Districts established at trial that students in the Plaintiff

---

**16.** Further, statewide, for those substandard certificate holders who took and failed the Praxis multiple times, the holders failed an average of two to three times apiece. However, substandard certificate holders in the Plaintiff districts who failed the Praxis multiple times failed an average of around five times apiece.

Districts are four times more likely than other students in South Carolina to be taught by someone holding a substandard certificate and a demonstrated inability to meet minimal teaching-competency standards.

Moreover, the Plaintiff Districts rely disproportionately on teachers for whom success on the Praxis is not required, which may include, *inter alia*, teachers who are not proficient in speaking English. For example, the trial evidence demonstrated that many of the teachers with substandard certification exhibit language deficiencies that hinder their ability to manage a classroom and communicate with students. In addition, because of an inability to fill teaching vacancies, the Plaintiff Districts commonly utilize long-term substitute teachers, who may lack a college degree and often do not have the training or experience required under the State's teacher certification regime. Exacerbating the negative effects on the students, the Plaintiff Districts are regularly forced to use these teachers to teach core classes, such as math and science.

Further, teachers in the Plaintiff Districts are more likely to have obtained their degree from a college whose graduates exhibit substandard performance on the Praxis examination. At the time of trial, 42% of teachers in the Plaintiff Districts graduated from colleges producing graduates that failed the Praxis at a rate of 53.9%. In school districts outside the Plaintiff Districts, only 29.6% of teachers graduated from these types of colleges.

Compounding the problem in the Plaintiff Districts is widespread teacher turnover. For example, in 2006, the State had a turnover rate of 11.3%. Seven of the eight Plaintiff Districts exceeded this rate, with turnover rates as high as 31.6%. In fact, from 2006–11, all of the Plaintiff Districts outpaced the state average turnover rate except for one district in 2006, one district in 2007, two districts in 2008, and two districts in 2009.

According to the Plaintiff Districts, in 2008, the General Assembly froze the required minimum teacher salaries to provide relief to those school districts that could not afford to fund increased salaries due to the economic recession. All of the Plaintiff Districts, except one, took this opportunity to freeze teacher salaries at 2008 levels until 2010. The Plaintiff Districts contend that this resulted in a widening gap between

those districts that could afford to maintain statutory pay increases, and those that could not. Put another way, poorer school districts that took advantage of the option to freeze salaries in order to continue operating are now at an even worse disadvantage for attracting competent and qualified teachers.

Generally, these types of policy determinations are outside this Court's scope and expertise. However, we cannot accept the trial court's reasoning that "what you do is more than what you are." This generalization requires elevation of anecdote over evidence. If certification does not matter, then why have certification at all? And if certification only matters in those districts with the ability to afford qualified teachers, in what way is an education scheme that permits this dynamic adequate? The trial court erred in holding that the Defendants' maintenance of an adequate teacher quality and certification regime translated into an adequate system of education delivery in the Plaintiff Districts.[17]

### F. Local Legislation & School District Size

The inputs and outputs described, *supra*, do not exist in a vacuum, but instead against a backdrop of two issues ignored by the Defendants *and* the Plaintiff Districts: the possible adverse impact of local legislation and the creation of school districts burdened with administrative costs disproportionate to their size.

■■■ This Court defers to the General Assembly when determining the constitutionality of a local law and will not declare that law unconstitutional unless it is unconstitutional

---

17. The dissent argues our factual findings above are "anathema to the rule of law" and "lack[ ] a discernable foundation and objective framework." Further, the dissent charges that the inputs alone are sufficient evidence that the Defendants have not committed a constitutional violation, and that the outputs (*i.e.*, the reality of how the inputs affect whether students are receiving the opportunity for a minimally adequate education) are largely irrelevant. We fail to understand how one could objectively view the appallingly high non-achievement rates by both the Plaintiff Districts and their students and claim that these students have received the opportunity for a minimal education. Indeed, despite the Defendants' laudable efforts, the high rates of non-achievement show the *lack* of an opportunity, thus making the outputs highly relevant.

beyond a reasonable doubt or there has been a clear abuse of legislative discretion. *Bd. of Trs. of Sch. Dist. of Fairfield Cnty. v. State*, 395 S.C. 276, 290, 718 S.E.2d 210, 217 (2011) [hereinafter *Fairfield Cnty.*].

▉▉▉ In the public education realm, we view local laws in light of the General Assembly's duties under Article XI of the South Carolina Constitution. *Id.* at 290–91, 718 S.E.2d at 217. In *McElveen v. Stokes*, we recognized that the scope of legislative power is much broader in dealing with school matters than is the scope in dealing with various other subjects. 240 S.C. 1, 10, 124 S.E.2d 592, 596 (1962). Thus, we have repeatedly sustained local laws pertaining to the state's public education system.[18] However, constitutional validity and practical effectiveness are not one and the same.

There is a tension, and perhaps an unhealthy one, inherent in a paradigm that balances, on the one hand, control of school districts by local legislative delegations, and, on the other, the Defendants' constitutional duty to ensure that all of South Carolina's public school children receive the constitutionally mandated opportunity. For example, because Senate and House districts cross county lines, many members of a legislative delegation may not be members of the county or district

---

18. *See Fairfield Cnty.*, 395 S.C. at 277–78, 718 S.E.2d at 211 (holding that General Assembly veto votes fell short of constitutionally required mandate, but recognizing the validity of the General Assembly's action transferring the oversight of a school district's financial operations from its Board of Trustees to a finance committee); *Bradley v. Cherokee Sch. Dist. No. One of Cherokee Cnty.*, 322 S.C. 181, 470 S.E.2d 570 (1996) (rejecting a taxpayer's claim challenging the validity of an act of the General Assembly authorizing a school district to impose a 1% sales tax), *overruled in part on other grounds by Home Builders Ass'n of S.C. v. Sch. Dist. No. 2 of Dorchester Cnty.*, 405 S.C. 458, 461–62 & n. 4, 748 S.E.2d 230, 232 & n. 4 (2013); *Smythe v. Stroman*, 251 S.C. 277, 289, 162 S.E.2d 168, 173 (1968) (upholding the General Assembly's consolidation of Charleston County's school districts); *McElveen*, 240 S.C. at 10, 124 S.E.2d at 596 ("The general school law ... is contained in Chapter 122, Sections 5272 through 5512, of the 1942 Code, as amended. Many of these sections contain special provisions relating to various counties. This chapter is immediately followed by Chapter 122–A, Sections 5513 through 5675, which contains special legislation relating mainly to the fiscal school affairs of each of the forty-six counties of the State."); *Moseley v. Welch*, 209 S.C. 19, 33, 39 S.E.2d 133, 140 (1946) (holding the General Assembly's action regarding one county's operation of its public schools not wholly unconstitutional).

that their education-related legislative actions may affect.[19] This fact alone begs for educational control more directly targeted to the needs of individual school districts, in line with the overarching principle of Home Rule, and accounting for the educational deficits evident in certain school districts. The Defendants fail to address how the state-wide education funding regime responds to fragmentary legislative control, and whether that control and resulting legislation has frustrated admirable education initiatives.

Additionally, the Plaintiff Districts are comprised in part of small, rural, school districts serving entire counties, or of small counties with multiple school districts. Some school districts in the instant case may consist of only three or four schools, with administrative costs which are disproportionate to the number of students served by that district, and which divert precious funding and resources from the classroom.[20] For example, Allendale, a school district composed of four schools and approximately 1,250 students, is currently led by one superintendent, and in its 2013 District Report Card received a Below Average rating, an improvement from 2011 and 2012, when it received an Unsatisfactory rating. In contrast, Lexington 5, a school district comprised of over 16,000 students, is also managed by one superintendent, but received an Excellent rating in 2013, consistent with its ratings from the four prior years. Surely, there are factors other than school district size at work; however, the effect of school district size on the provision of a minimally adequate education must be examined.[21]

---

**19.** *See* Holly H. Ulbrich, *School District Organization and Governance in South Carolina,* Clemon Univ.'s Strom Thurmond Inst. of Gov't & Pub. Affairs, 24 (Mar.2010), *available for download at* http://sti.clemson.edu/ publications–mainmenu–38/commentaries–mainmenu–211/cat_view /29–jim–self–center–on–the–future/67–education.

**20.** *See* Ulbrich, *supra* note 19, at 11 ("However, the density of student population is also an important cost factor. Small rural districts do not often see large cost savings when they are consolidated, because the scattered student population is not only more costly (per pupil) to transport, but also results in smaller schools and smaller classes so that students do not have to travel long distances to larger, consolidated schools.").

**21.** In the past, the General Assembly has failed to consider this issue:

Nevertheless, the Plaintiff Districts failed to explore this dynamic and its effect on their students, nor presented to this Court options and solutions regarding the structure of these school districts themselves. For example, solutions could include cross-county consolidation, which has been met with success in other areas of South Carolina, or measures to reduce administrative costs in school districts where funds are most needed in the classroom. Instead, the Plaintiff Districts have opted for a course of self-preservation, placing all blame for the blighted state of education in their districts at the feet of the Defendants. In comparing the Plaintiff Districts' problems with the problems facing other school districts throughout the State, we conclude that this is not a fair characterization.

Our discussion of local legislation and school district size is not intended to demonize legislative delegation control, or provide an optimal size for education administration. Both of these decisions are exclusively within the Defendants' province. However, it is striking that the parties to the instant litigation have focused narrowly on a struggle between education expenditures and education outcomes while ignoring the overarching dilemmas emanating from the organizational structure of public education.

---

In 2005, the South Carolina legislature created a temporary committee to "study the size of school districts in South Carolina and the number of teacher work days and make recommendations on the school district size which will allow for more direct spending on teacher salary and instructional support." The School District Study Committee found significant differences in spending per pupil at the district management and program management level (but not in classroom instruction) between the 20 smallest and 20 largest districts in the state. The estimated average difference in that group of costs was $277 per pupil.

The committee calculated potential savings from having one district per county by taking lowest district per pupil expenditure in each multidistrict county and multiplied that figure by the number of districts in the county. Based on this rather simplistic methodology, the committee anticipated savings of $1.1 million or $1,022 per teacher, $46 per pupil. *However, this study does not take into account the higher cost of serving rural areas in terms of higher transportation costs per pupil and smaller schools and smaller classes that are dictated by the distribution of students in space, not by the size of the district.*

Ulbrich, *supra* note 19, at 12 (emphasis added) (footnotes omitted) (internal alteration marks omitted).

## G. *Existence of the Opportunity*

We hold that South Carolina's educational funding scheme is a fractured formula denying students in the Plaintiff Districts the constitutionally required opportunity. However, because resolution of this case will require policy determinations outside the purview of this Court, we must be mindful of our proper role in articulating the reasoning and breadth of this decision. *See Abbeville I,* 335 S.C. at 69, 515 S.E.2d at 541.

## III. Judicial Intervention

In *Brown v. Board of Education,* the United States Supreme Court struck down the "separate but equal" doctrine in the field of public education. 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Contrary to a common misconception, the *Brown* Court did not base its ruling solely on the superiority of facilities and instruction of schools open only to white students. The record before the Supreme Court demonstrated that, in some of the consolidated cases known as *Brown,* "black" schools had been or were being equalized with regard to buildings, curricula, qualifications and salaries of teachers, and other "tangible" factors. *Id.* at 492, 74 S.Ct. 686. However, the Supreme Court addressed whether segregation of children in public schools solely on the basis of race—even though facilities and other "tangible" factors may be equal—still worked to deprive children of the minority group of equal educational opportunities. *Id.* at 493, 74 S.Ct. 686.

*Briggs v. Elliott* was the South Carolina case consolidated with *Brown. See* 98 F.Supp. 529 (E.D.S.C.1951), *rev'd sub nom. Brown v. Bd. of Educ. (Brown I),* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The Briggs trial in Charleston was before a three-judge panel. Evidence of the deleterious effects of racial segregation was dramatically presented. The majority ruled against the Clarendon County plaintiffs. *Id.* at 537–38. In dissent, Judge Waties Waring wrote that, in challenges to segregation in higher education,

the Supreme Court clearly recognized that education does not alone consist of fine buildings, class room furniture and appliances but that included in education must be all the intangibles that come into play in preparing for meeting life.

. . .

I am of the opinion that all of the legal guideposts, expert testimony, common sense and reason point unerringly to the conclusion that the system of segregation in education adopted and practiced in the State of South Carolina must go and must go now.

Segregation is per se inequality.

*Id.* at 545, 548 (Waring, J., dissenting).

Ultimately, in *Brown,* the Supreme Court held that separation based on race-generated feelings of inferiority as to status in the community that could affect a student's heart and mind in a way unlikely ever to be undone, relying on the ruling urged by Judge Waring. *See Brown,* 347 U.S. at 494, 74 S.Ct. 686. The Supreme Court observed:

Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the [N]egro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to retard the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racially integrated school system.

*Id.* (internal marks omitted).[22] The Supreme Court did not announce judicial standards for analyzing these considerations, but instead relied on factors "incapable of objective measure-

---

22. The Supreme Court relied, in part, on its previous decisions in *Sweatt v. Painter,* 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950), and *McLaurin v. Oklahoma State Regents for Higher Education,* 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 (1950), two cases decided the same day in which the Supreme Court considered the intangible factors associated with various educational opportunities. In *Sweatt,* the Supreme Court found that a segregated law school could not provide African–Americans with equal educational opportunities, citing "those qualities which are incapable of objective measurement but which make for greatness in a law school." *Sweatt,* 339 U.S. at 634, 70 S.Ct. 848. In *McLaurin,* the Supreme Court found that an African–American student should be admitted to a white graduate school, and be treated like other students, because of the importance of his "ability to study, to engage in discussions and exchange views with other students, and in general to learn his profession." *McLaurin,* 339 U.S. at 641, 70 S.Ct. 851.

ment" and the mental and emotional feelings of inferiority segregation placed in the minds of African–Americans. *Id.* at 494–95, 74 S.Ct. 686.

We follow the example set in *Brown* and its progeny, and apply that reasoning to the instant case.[23] The measurable inputs and outputs show that the Defendants have failed to provide students in the Plaintiff Districts the requisite constitutional opportunity. Inadequate transportation fails to convey children to school or home in a manner conducive to even minimal academic achievement. Students in the Plaintiff Districts receive instruction in many cases from a corps of unprepared teachers. Students in these districts are grouped by economic class into what amounts to no more than educational ghettos, rated by the Department of Education's guidelines as substandard. Large percentages of the students in the Plaintiff Districts—over half in some instances—are unable to meet minimal benchmarks on standardized tests, but are nonetheless pushed through the system to "graduate."

While the Defendants and the dissent point to the amount of spending in the Plaintiff Districts, this spending fails to provide students with the opportunity to obtain a minimally adequate education. Rather, the evidence demonstrates that there is a clear disconnect between spending and results. This Court cannot suggest methods of fixing the problem, but we can recognize a constitutional violation when we see one.

The constitutional duty to ensure the provision of a minimally adequate education to each student in South Carolina rests with the Defendants. To that end, the General Assembly is charged with identifying the issues preventing the State's current efforts from providing the requisite constitutional opportunity. However, this Court would be remiss in not discussing the critical issue of poverty, which the trial of this

---

**23.** Respectfully, we disagree with the dissent's statement that our invocation of *Brown* is "good theatre, but [ ] has no relevancy here." Rather, given the facts before this Court, we believe *Brown's* rationale has a clear import to the instant case. At no point have we ever required a party to raise a specific case at the lower court level, or for a lower court to cite a specific case in its order, prior to us citing the case as authority in an opinion at the appellate level. Moreover, should the dissent disagree, we point to its discussion of women's suffrage which, to the extent *Brown* is in fact irrelevant here, we likewise find irrelevant and improper.

case demonstrates contributes to the chasm between legislative funding and student achievement.

### Poverty and Funding

The Defendants correctly argue that the effect of poverty on student achievement must be considered in deciding this case. The trial court determined that student achievement is not significantly related to funding, teacher characteristics, or other school inputs. As discussed, *supra*, we disagree. However, the trial court concluded, based on evidence presented by both the Plaintiff Districts and the Defendants, that poverty accounts for the fact that students in some districts perform better than students in others. The Record unequivocally supports this conclusion, as all of the expert testimony combined to reveal that a focus on poverty within the Plaintiff Districts likely would yield higher dividends than a focus on perhaps any other variable.

For example, the Defendants presented expert analysis which "factored out" the characteristics of poverty from other inputs in the educational process. The results of that analysis revealed that, except for the factor of poverty, there is little difference between schools in the Plaintiff Districts and other public schools.

Further, the Plaintiff Districts presented expert analysis that two-thirds of the difference in the PACT scores at the district level could be accounted for by differing percentages of students on free and reduced lunch. In other words, if all of the districts in South Carolina had the same percentage of students on free and reduced lunch, the range of average PACT scores would only be one-third as great as statistics currently show. Remarkably, this result would hold true *with no change to any other variable,* including funding, teacher certification, teacher turnover, or professional development.

The Plaintiff Districts also presented other expert analysis which demonstrated that due to poverty, many children are behind in abilities that they need to succeed in school before that schooling even begins. In response to the trial court's finding of a constitutional violation, the Defendants established the Child Development Education Pilot Program (CDEPP). The General Assembly created CDEPP to focus on the devel-

opment and learning preparation young children need for school, and to incorporate parental education.

In 2011–12, at-risk students received primary access to CDEPP, which appeared to have some moderate success at curing the students' lack of preparation to begin their formal education. However, CDEPP's success was tempered by worrisome implementation and execution.

For example, a recent evaluation of CDEPP conducted in January 2010 documented modest and meaningful improvement in school readiness for the children enrolled. However, the report showed that 24 of 36 participating school districts maintained waiting lists for CDEPP. A program report for 2011–12 warned that funding limitations negatively impacted the CDEPP program:

> Because the EIA limited appropriations to CDEPP, the full per pupil funding amount of $4,218 was reduced to $3,670 per pupil. No funding for professional development or supplies and materials was given. Any further per pupil reductions could result in districts discontinuing the program. The [Department of Education] has also not renegotiated services with contracted personnel due to budgetary constraints, thus reducing the amount of technical assistance provided.

Naturally, the Defendants have a competing view of CDEPP. According to the Defendants, CDEPP funding has continued into the current fiscal year and is now funded on a recurring basis. The funded cost per child in 2011–12 was $4,218, and was allegedly set to be increased annually with inflation. Providers transporting eligible children to and from school may receive reimbursement of $550 per child. The Defendants do not directly refute the claim by the Plaintiff Districts that CDEPP is inadequately funded to meet student needs. While CDEPP undeniably demonstrates positive movement toward assuring that students in the Plaintiff Districts are provided their constitutionally mandated educational opportunity, it is unclear how the Defendants can effectively utilize the program absent full funding and implementation.

## IV. The Remedy

The principle of separation of powers directs that the legislature, not the judiciary, is the proper institution to make

major educational policy choices. Bess J. Durant, *The Political Question Doctrine: A Doctrine for Long–Term Change in our Public Schools*, 59 S.C. L.Rev. 531, 531 (Spring 2008). Thus, the General Assembly is primarily responsible for school finance reform. *Id.* In light of this sacrosanct principle, we refuse to provide the General Assembly with a specific solution to the constitutional violation. However, the Defendants may find the remedies fashioned by other states' courts instructive.

Several state appellate courts have addressed situations similar to this one.[24] However, based on similar underlying facts and analyses, two cases stand out as particularly instructive: *Campaign for Fiscal Equity v. State (CFE II)*, 100 N.Y.2d 893, 769 N.Y.S.2d 106, 801 N.E.2d 326 (2003), and *Campbell County School District v. State*, 907 P.2d 1238 (Wyo.1995).[25]

---

**24.** *See, e.g., Idaho Schs. for Equal Educ. Opportunity v. State*, 142 Idaho 450, 129 P.3d 1199, 1209 (2005) ("We affirm the district court's conclusion that the current method of funding as it relates to school facilities is unconstitutional...."); *Comm. for Educ. Equal. v. State*, 294 S.W.3d 477, 493 (Mo.2009) ("And in the absence of a constitutional bar, it is clear that the legislature has plenary power to act in crafting the school funding formula."); *Leandro v. State*, 346 N.C. 336, 488 S.E.2d 249, 261 (1997) ("If on remand of this case to the trial court, that court makes findings and conclusions from competent evidence to the effect that defendants in this case are denying children of the state a sound basic education, a denial of a fundamental right will have been established."); *Cox ex rel. Cox v. State*, 191 Or.App. 1, 80 P.3d 514, 515 (2003) (affirming the lower court determination that the State's education funding method did not violate the state constitution); *Brigham v. State*, 179 Vt. 525, 889 A.2d 715, 720–21 (2005) (finding that students and taxpayers presented valid claims challenging the State's education funding system based on equal opportunity and proportional contribution grounds); *Campbell Cnty. Sch. Dist. v. State*, 907 P.2d 1238, 1279 (Wyo.1995) ("Because education is one of the state's most important functions, lack of financial resources will not be an acceptable reason for failure to provide the best educational system.").

**25.** The dissent mischaracterizes the Court's discussion of these cases. According to the dissent, "[a]s for the remedy, the Court relies heavily on case law from New York and Wyoming." However, this statement overlooks our refusal to provide the Defendants with a solution, and our view that the Defendants may simply find decisions from other states "instructive."

As we explicitly acknowledged above, the Defendants are the sole arbiters of educational policy choices. Rather than dictating that the

## CFE II

In *CFE II*, the New York Court of Appeals addressed whether the state funding system provided a sound basic education to New York City students. 801 N.E.2d at 328. The Education Article of the New York Constitution states that "[t]he legislature shall provide for the maintenance and support of a system of free common schools wherein all the children of this state may be educated." *Id.* at 327–38 (quoting N.Y. Const., art. XI, § 1). Eight years prior to the case, in *CFE I*, the court interpreted the clause to mean that New York "obligated itself [ ] to ensure the availability of a 'sound basic education' to all its children." *Id.* at 328 (citing *Campaign for Fiscal Equity v. State (CFE I)*, 86 N.Y.2d 307, 631 N.Y.S.2d 565, 655 N.E.2d 661 (1995)).

The New York Court of Appeals equated a sound basic education with " 'the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury.' " *Id.* at 330 (quoting *CFE I*, 655 N.E.2d at 666). Although this fundamental definition is somewhat similar to this Court's interpretation of the South Carolina Constitution's minimally adequate standard, the New York court went further in finding that a sound basic education conveys "not merely skills, but skills fashioned to meet a practical goal: meaningful civic participation in contemporary society." *Id.*

During the *CFE II* trial, the trial court looked to evidence on what the "rising generation" needed in order to function productively as civic participants, and concluded that "this preparation should be measured with reference to the demands of modern society and include some preparation for employment." *Id.* at 328. Ultimately, it determined that the State had consistently violated the Education Article. *Id.* The trial court found that the necessary instructional inputs were deficient,[26] that the outputs-including test results and gradua-

---

Defendants follow our own views on how to fix the problems faced by the Plaintiff Districts, which would grossly exceed our judicial authority, we merely offer our discussion of these two cases as a suggestion to the Defendants on where they might turn to obtain guidance in their future policy decisions.

**26.** The trial court in *CFE II* found that schools with the highest percentage of minority students had the least experienced teachers, the

tion rates—reflected systemic failure, and that the State's actions contributed substantially to the constitutional violation. *Id.* The trial court directed the defendants to enact systemic reforms. *Id.*

The New York Court of Appeals affirmed the trial court's holding that the State had denied New York City school children a sound basic education. *Id.* at 348. However, the Court of Appeals stopped short of implementing the trial court's sweeping directive to reform the entire education system to ensure that every school district had the resources necessary to provide a sound basic education. *Id.* at 345. Instead, the Court of Appeals ordered the defendants to ascertain the cost of providing a sound basic education in New York City, create a scheme which allowed for adequate resources to every district to provide that education, and ensure a system of accountability to measure whether the reforms provide the opportunity for a sound basic education. *Id.* at 348.

### Campbell County

In *Campbell County,* the Supreme Court of Wyoming ruled parity a necessary part of the education system, but allowed for differences in local conditions including special needs, problems, and educational cost differentials. 907 P.2d at 1279. The court's holding in that case is particularly illuminating:

> To summarize, considering all of these various factors, the legislature must first design the best educational system by identifying the "proper" educational package each Wyoming student is entitled to have.... The cost of that educational package must then be determined and the legislature must

---

most uncertified teachers, the lowest-salaried teachers, and the highest rates of teacher turnover. 769 N.Y.S.2d 106, 801 N.E.2d at 333–34. Further, the plaintiffs in that case presented proof that New York City schools had excessive class sizes, and that class size affects learning. *Id.,* 769 N.Y.S.2d 106, 801 N.E.2d at 335. Plaintiffs presented unrebutted testimony that books in city schools were old and not integrated with contemporary curricula. *Id.,* 769 N.Y.S.2d 106, 801 N.E.2d at 336. Finally, the trial court analyzed evidence regarding the use of computers in city schools. It found that some exposure to computers was essential, but that city schools only provided about half as many computers per student as all other New York schools, and that in some cases the aging equipment could not support available software. *Id.*

then take the necessary action to fund that package. Because education is one of the state's most important functions, lack of financial resources will not be an acceptable reason for failure to provide the best educational system. . . .

The state financed basket of quality educational goods and services available to all school-age youth must be nearly identical from district to district. If a local district then wants to enhance the content of that basket, the legislature can provide a mechanism by which it can be done. But first, before all else, the constitutional basket must be filled. *Id.* at 1279–80.

### *The Plaintiff Districts*

The instant case presents a somewhat distinguishable constitutional standard from those found in *CFE II* and *Campbell County;* therefore, this case may demand different decisions to be made by the General Assembly as to how best to provide our State's students their opportunity for a minimally adequate education. However, our present circumstances are similar to both *CFE II* and *Campbell County* in that our State's education system fails to provide school districts with the resources necessary to meet the minimally-adequate standard. In addition, the cost of the educational package in South Carolina is based on a convergence of outmoded and outdated policy considerations that fail the *students* of the Plaintiff Districts. Though the evidence demonstrates the intersection of statutes and ever increasing funding streams, it does not show, at least to this Court, a comprehensive effort by the Defendants to determine the demands of providing the constitutionally mandated educational opportunity throughout the State. In our opinion, without that determination, it is near impossible for the Defendants to meet their constitutional obligation.

Across the nation, state courts have conducted forays into the school funding arena with mixed results. *See* Durant, 59 S.C. L.Rev. at 546. These incursions have at times infringed upon legislative prerogative, and now and again demonstrated the judiciary's inability to account for a number of policy decisions and practical considerations. *Id.* at 546–47. This Court will avoid a quagmire which would only serve to unnec-

essarily involve this Court in the Defendants' bailiwick, while at the same time adding unnecessary delay in solving the crisis affecting students in the Plaintiff Districts.

It is time for the Defendants to take a broader look at the principal causes for the unfortunate performance of students in the Plaintiff Districts, beyond mere funding. Fixing the violation identified in this case will require lengthy and difficult discussions regarding the wisdom of continuing to enact multiple statutes which have no demonstrated effect on educational problems, or attempting to address deficiencies through underfunded and structurally impaired programming.

Moreover, the Plaintiff Districts must work in concert with the Defendants to chart a path forward which appropriately prioritizes student learning. Time and again in the Plaintiff Districts, priorities have been skewed toward popular programs. Athletic facilities and other auxiliary initiatives received increased attention and funding, while students suffered in crumbling schools and toxic academic environments. Additionally, the Plaintiff Districts' administrative costs divert funds from the classroom. The Defendants and the Plaintiff Districts must work together to set balanced priorities, and consider and apply the benefits of consolidation or cross-consolidation, which may abate those administrative costs that unnecessarily detract from resources desperately needed by students in their districts.[27] It is critical that the Defendants and the Plaintiff Districts discuss with county legislative delegations and school boards the prudence of creating school districts filled with students of the most disadvantaged socioeconomic background, exposing students in those school districts to substandard educational inputs, and then maintaining that nothing can be done to improve those school districts' unacceptable performances.[28]

---

27. It appears that Dillon 2 and Marion 7 in particular have taken admirable steps toward consolidation since the time of trial, as Dillon 1 and 2 consolidated into Dillon 4, and Marion 1, 2, and 7 consolidated into Marion 10. *See Report Cards, supra* note 12 (listing Dillon 1, 2, and 3 in the 2011 list of South Carolina schools, but listing only Dillon 3 and 4 starting in 2012; listing Marion 1, 2, and 7 in the 2012 list of South Carolina schools, but listing only Marion 10 in the 2013 list of South Carolina schools).

28. Despite the dissent's assertions to the contrary, and as is evident from the above discussion, we do not (nor could we legally) merely

Therefore, we direct both the Plaintiff Districts and the Defendants to reappear before this Court within a reasonable time from the issuance of this opinion, and present a plan to address the constitutional violation announced today, with special emphasis on the statutory and administrative pieces necessary to aid the myriad troubles facing these districts at both state and local levels.[29] However, we give leave to the parties to suggest to the Court precisely how to proceed. In particular, we invite the parties to make additional filings suggesting a specific timeline for the reappearance, as well as specific, planned remedial measures. Until the reappearance, we will retain jurisdiction of this case. *Cf. Brown II*, 349 U.S. at 300–01, 75 S.Ct. 753 (retaining jurisdiction of the case until the defendants made a "prompt and reasonable start toward full compliance" with the ruling from *Brown I*).

## CONCLUSION

During this case, the Defendants asserted that achievement may not be legislated, and that this Court could not possibly review the Plaintiff Districts' claims as they presented non-

---

order the Defendants to disperse additional funding to the Plaintiff Districts. We believe that all parties could agree that—given that the Defendants have disproportionately funded poorer counties such as the Plaintiff Districts in the past with little noticeable impact on student achievement rates—money alone is not the answer.

**29.** *See, e.g., Brown v. Bd. of Educ. (Brown II)*, 349 U.S. 294, 300–01, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) ("While giving weight to these public and private considerations, the courts will require that the defendants make a prompt and reasonable start toward full compliance with our May 17, 1954, ruling. Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date. To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools, on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems. They will also consider the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system. During this period of transition, the courts will retain jurisdiction of these cases.").

justiciable political questions. These arguments ring hollow when compared to the Defendants' failure to comprehensively analyze the troubling issues preventing educational opportunity in the Plaintiff Districts.

However, fault in this case—and more importantly, the burden of remedying this constitutional deficiency—does not lie solely with the Defendants. As discussed, *supra*, the Plaintiff Districts must examine their own important role in advancing reform and placing students at the forefront of organizational decision-making and policy. The Plaintiff Districts presented much of this case as a manipulative political argument, framing the dispute within some of our State's most disturbing historical images, and couching this case's most meaningful aspects in conventions which deny our progress. This approach simultaneously ignores their own actions in helping to create devastating metrics and outcomes.

Thus, the winner here is not the Plaintiff Districts, but fittingly, the students in those districts and throughout the State. Further, there is no *loser*. The substance of our finding today places before the parties a new opportunity, resting solidly on this Court's precedent, but leaning forward towards a conversation unencumbered by blame. The Defendants and the Plaintiff Districts must identify the problems facing students in the Plaintiff Districts, and can solve those problems through cooperatively designing a strategy to address critical concerns and cure the constitutional deficiency evident in this case.

Nevertheless, it is the Defendants who must take the principal initiative, as they bear the burden articulated by our State's Constitution, and have failed in their constitutional duty to ensure that students in the Plaintiff Districts receive the requisite educational opportunity. Thousands of South Carolina's school children—the quintessential future of our state—have been denied this opportunity due to no more than historical accident.

Thus, we find in favor of the Plaintiff Districts, and the decision of the trial court is

**AFFIRMED AS MODIFIED.**

BEATTY and HEARN, JJ., concur. KITTREDGE, J., dissenting in a separate opinion in which PLEICONES, J. concurs.

Justice KITTREDGE.

With great respect for the majority, I dissent. Today, the Court elevates personal policy preferences to constitutional status and justifies its transgression simply by invoking the virtues of educational advancement. I view the Court's decision as a policy opinion on the state of public education in South Carolina, in direct contravention of what this Court said it would not do in *Abbeville I*—act as a "super-legislature."

I begin by recognizing the emotional appeal in today's decision. I further acknowledge the self-evident truth concerning the critical importance of public education to the citizens of South Carolina. Indeed, all parties to this two-decades-old lawsuit so stipulate. For many, particularly those who understandably hunger for positive change in South Carolina's public education system without concern for the source of that positive change, today's policy mandate to the South Carolina General Assembly will be embraced and applauded. As a citizen of our great State, I would find much to cheer about in the majority's decision. I, however, approach this so-called legal case not as a private citizen, but as a judge constrained by the rule of law and the inherent constitutional limitations upon the power of the Judicial Branch. Based on my view of the rule of law, especially the principle of separation of powers, I believe the Court has overstepped its bounds.

I would overrule *Abbeville I*, as I believe it represents a nonjusticiable political question. Nevertheless, as *Abbeville I* is the law of this case, we are constrained to resolve this appeal through the qualitative notion of a "minimally adequate education." 335 S.C. 58, 68, 515 S.E.2d 535, 540 (1999). Under the *Abbeville I* framework, I would affirm the trial court's dismissal of Appellants–Respondents' (collectively Plaintiff Districts) state constitutional claim and reverse the finding of a constitutional violation of inadequate funding of pre-school, early childhood education programs.

## I.

The South Carolina Constitution vests the legislative power of the State in the General Assembly and the judicial power in the courts. S.C. Const. arts. III, § 1; V, § 1. Thus, our constitutional construct directs that judges "refrain from scaling the walls that separate law making from judging, for '[w]ere the power of judging joined with the legislative ... *the judge* would then be *the legislator.*'" *City of Pawtucket v. Sundlun,* 662 A.2d 40, 58 (R.I.1995) (alteration and omission in original) (quoting *The Federalist No. 47,* at 303 (James Madison) (Clinton Rossiter ed.1961)). "Notwithstanding our personal dedication to education and our appreciation of its significance in the lives of people of all ages, it is clearly our duty to determine the law, not to make the law." *Id.* at 57 (quoting *United States v. Nixon,* 418 U.S. 683, 703, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)).

I acknowledge that to some courts and judges, the concept of "the rule of law" has expanded over time from adjudicating to legislating. In some circles, the constitution has been reduced to nothing more than a vending machine that allows a person to select constitutional "rights" that mirror personal preferences. That is not my view of the rule of law or the United States Constitution or South Carolina Constitution. While judges have a duty to strike down legislation in violation of the constitution, it is my view that judges must demonstrate restraint in the enforcement of our duty, particularly when it comes to *creating* law. Courts should not interpret the constitution in a manner that creates rights and duties out of thin air, such that one's policy preference is accorded constitutional status. Indeed, "[i]t can be of no weight to say that the courts, on the pretense of a repugnancy, may substitute their own pleasure to the constitutional intentions of the legislature." *The Federalist No. 78,* at 579 (Alexander Hamilton) (John Hamilton ed., 1866). Such an approach is anathema to the rule of law, separation of powers, checks and balances, and indeed the very foundation on which our civil society was established.

## II.

The proper question before the Court in *Abbeville I* was which branch of government is constitutionally assigned re-

sponsibility for funding and making policy decisions concerning public education. The South Carolina Constitution answers this question with unmistakable clarity:

> The General Assembly shall provide for the maintenance and support of a system of free public schools open to all children in the State and shall establish, organize and support such other public institutions of learning, as may be desirable.

S.C. Const. art. XI, § 3.[30]

This Court's construction of the Education Clause in *Abbeville I* to require a minimally adequate education, while well intentioned, does not give rise to a legal issue that this Court is capable of resolving. Indeed, "[t]he province of the court is, solely, to decide on the rights of individuals, not to enquire how the ... [political branches of government] perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to [a political branch], can never be made in this court." *Marbury v. Madison*, 5 U.S. 137, 170, 1 Cranch 137, 2 L.Ed. 60 (1803).

In my view, the term "minimally adequate education" is purposely ambiguous,[31] objectively unknowable, and unworkable in a judicial setting. This lawsuit asks the courts to not only enter into, but to be the ultimate decider of, the long-standing debate over the merits of state education policy decisions and mandates. I believe these policy determinations are quintessentially nonjusticiable political questions which the constitution indubitably assigns to the General Assembly. *See Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 ("Prominent on the surface of any case held to involve a

---

**30.** I recognize that the Executive Branch, through the office of the Governor and the Secretary of Education, has a key role in formulating and advancing public education policy matters. *See* S.C. Const. art XI, § 2 ("There shall be a State Superintendent of Education who shall be the chief administrative officer of the public education system of the State...."). However, the issue before the Court is limited to article XI, section 3 of the state constitution juxtaposed to the purported role of the Judicial Branch in this area.

**31.** The majority in *Abbeville I* referred to its "outline" of the constitutional requirement of a minimally adequate education as "deliberately broad parameters." 335 S.C. at 69, 515 S.E.2d at 540.

political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government...."); *Bonner ex rel. Bonner v. Daniels*, 907 N.E.2d 516, 518 (Ind.2009) (finding a constitutional provision required the legislature to establish free public schools, but "does not impose upon government an affirmative duty to achieve any particular standard of resulting educational quality. This determination is delegated to the sound legislative discretion of the General Assembly.").[32]

Granted, it is axiomatic that in carrying out its numerous constitutional responsibilities, the General Assembly must discharge its duties in a minimally adequate manner. However, such a conclusion does not transform the exercise of legislative discretion into a legal controversy suitable for judicial resolution. The fact that our courts have wrestled with this policy matter for more than two decades, with no end in sight, is telling. In a sense, today's mandate to the General Assembly to submit its education legislative agenda to this Court for review may only be the beginning of the Court's involvement in educational policy-making.

---

**32.** The majority, of course, contends a justiciable controversy is presented. While admitting that "Courts may experience difficulty in determining the precise parameters of constitutionally acceptable behavior," the majority states, "this imprecision does not necessarily signify that courts cannot determine when a party's actions ... fall outside the boundaries of such constitutional parameters." As part of the legal support for a finding of justiciability, the majority cites to Justice Potter Stewart's famous saying, "I know it when I see it." *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring). The majority further states that it "cannot suggest methods of fixing the problem, but we can recognize a constitutional violation when we see one." I am not a proponent of the "I know it when I see it" jurisprudence. As applied to this case, the General Assembly is left to grope in the dark, and the net effect is that the General Assembly must revamp the educational system without knowing what criteria will be used by this Court to judge the "constitutionality" of its response.

*Abbeville I* purported to set forth a narrow constitutional holding. The Abbeville I Court "recognize[d] that we are not experts in education, and we do not intend to dictate the programs utilized in our public schools.... [T]he constitutional duty ... rests on the legislative branch of government," and "[w]e do not intend by this opinion to suggest to any party that we will usurp the authority of that branch to determine the way in which educational opportunities are delivered to the children of our State." 335 S.C. at 69, 515 S.E.2d at 540–41. Moreover, the Court stated "[w]e do not intend the courts of this State to become super-legislatures or super-school boards." *Id.* at 69, 515 S.E.2d at 541. Yet, this call for judicial restraint quickly collapsed on remand, notwithstanding the efforts of Judge Cooper to construe *Abbeville I* in a reasonable and objective manner, because the asserted claims defy judicial resolution.

The matters before *Abbeville I* and this Court today do not lie within the Judicial Branch, and the suggestion that they are proper for judicial resolution at the subjective whim of judges should be categorically rejected. Justice Moore, dissenting in *Abbeville I,* said it well:

> While I agree with the majority's holding that [Plaintiff Districts] have no private cause of action under the Education Finance Act, I find it disconcerting that the majority concludes, on the other hand, that [Plaintiff Districts] can maintain such an action under the Education Clause which contains no reference to minimum standards. The incongruous result is that legislative education standards are not subject to judicial enforcement but standards emanating from judicial embellishment on our constitution are.

335 S.C. at 71–72, 515 S.E.2d at 542 (Moore, J., dissenting).

The trial of this case on remand from *Abbeville I* proves my point–102 days of trial, over 100 witnesses and more than 4,000 documents entered into evidence. The Plaintiff Districts' asserted "constitutional" claim under the Education Clause transcends judicial ken and, if judicially resolved, requires courts to act as super-legislatures and super-school boards, in defiance of *Abbeville I's* stated intentions. By way of example, the Plaintiff Districts claimed the following were

proper for court resolution under the minimally adequate education standard:

- judicial assessment of whether school buildings and facilities are adequate;
- judicial assessment of whether South Carolina's Curriculum Standards encompass the knowledge and skills necessary to satisfy the definition for a minimally adequate education;
- judicial assessment of whether the system of teacher licensure is sufficient to ensure at least minimally competent teachers; and
- judicial assessment of whether the funding of public education by the General Assembly is constitutional.

Faced with an analogous "broad call on judicial power to assume continuing regulatory jurisdiction over the activities" of the political branches of government, the United States Supreme Court found a lawsuit claiming the government failed to adequately train the Ohio National Guard presented a nonjusticiable controversy. *Gilligan v. Morgan,* 413 U.S. 1, 5, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973). In *Gilligan,* students at Kent State University filed suit seeking declaratory and injunctive relief following the shooting death of four students during an anti-Vietnam War protest in May 1970, claiming that the National Guard's use of lethal force was the result of inadequate training. *Id.* at 3–5, 93 S.Ct. 2440. In concluding no justiciable controversy was presented, the Supreme Court stated:

The relief sought by respondents, requiring initial judicial review and continuing surveillance by a federal court over the training, weaponry and orders of the Guard, would therefore embrace critical areas of responsibility vested by the Constitution in the Legislative and Executive Branches of the Government.

. . . .

This would plainly and explicitly require a judicial evaluation of a wide range of possibly dissimilar procedures and policies approved by different law enforcement agencies or other authorities; and the examples cited may represent only a fragment of the accumulated data and experience. . . . It would be inappropriate for a district judge to

undertake this responsibility in the unlikely event that he possessed the requisite technical competence to do so.

. . . .

It would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible—as the Judicial Branch is not—to the electoral process. Moreover, it is difficult to conceive of an area of governmental activity in which the courts have less competence. . . . The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability. It is this power of oversight and control of military force by elected representatives and officials which underlies our entire constitutional system.

*Id.* at 8–10, 93 S.Ct. 2440 (internal marks omitted). Likewise, I believe it is entirely inappropriate for this Court to undertake continuing judicial surveillance of the system of public education in our State.

Further, the Plaintiff Districts requested that the Court order the General Assembly to draft a new system for education funding and to appropriate funding necessary to remedy past alleged inequities in funding. I note such a remedy is unavailable in any event, at least if we honor our precedents. *See State ex rel. Condon v. Hodges,* 349 S.C. 232, 244, 562 S.E.2d 623, 630 (2002) (noting the duty and authority to appropriate money belongs entirely to the legislative branch); *Clarke v. S.C. Pub. Serv. Auth.,* 177 S.C. 427, 181 S.E. 481, 484 (1935) (finding the General Assembly has full authority to make appropriations as it deems wise in the absence of any specific constitutional prohibition against such appropriation). Even the majority opinion acknowledges that "resolution of this case will require policy determinations outside the purview of this Court."

Given the Plaintiff Districts' allegations, the text of the Education Clause, and the system of free public schools provided by the Legislature, the trial court properly found that the General Assembly has not violated its constitutional mandate. The Court today reverses this primary determination of the trial court. In this regard, determining what

constitutes an adequate education is so subjective as to defy judicial resolution. However, this Court, in *Abbeville I*, proceeded to judicially engraft a qualitative standard into our state constitution so it could then interpret its meaning. In my judgment, this was error and was fundamentally inconsistent with the plain language of our state constitution, which speaks only of the General Assembly and its duty to create and maintain a public school system.

By permitting the case to go forward, we presented Judge Cooper, one of the finest jurists ever to serve South Carolina, with an impossible task—determining a complex series of legislatively assigned public policy and funding questions under the guise of a legal case appropriate for judicial resolution. He is to be commended for his valiant effort to untangle the Gordian Knot of *Abbeville I*. I would also observe that Judge Cooper rendered a relatively prompt decision and a thorough 170–page order while this Court was unable to render a decision following the initial oral arguments in June 2008 such that the matter had to be reheard in September 2012.

Judge Cooper recognized the ambiguity inherent in the phrase "minimally adequate education." Moreover, although constrained by *Abbeville I's* mandate, he understood that it is a "legislative, not judicial, duty:"

> The Supreme Court has previously observed that our Constitution "places very few restrictions on the power of the General Assembly in the general field of public education." *Richland County,* 294 S.C. at 349, 364 S.E.2d at 472 (quoting *Moseley,* 209 S.C. at 33, 39 S.E.2d at 140). Moreover it is well established that "[w]hen the Legislature has enacted a rule embodying a particular policy choice, the courts have no power to annul the Legislature's judgment by substituting their own views of sound public policy. It is not the province of the courts to perform legislative functions". *Holman v. Bulldog Trucking Co.,* 311 S.C. 341, 348, 428 S.E.2d 889, 893 (App.1993) (internal citation omitted) (citing *Henderson v. Evans,* 268 S.C. 127, 232 S.E.2d 331 (1977)). Stated differently, the responsibility for the justice or wisdom of legislation rests exclusively with the legislature, whether or not [a court] agree[s] with the laws it enacts. *Adkins v. Comcar Indus., Inc.,* 316 S.C. 149, 151, 447 S.E.2d 228, 230 (App.1994), *aff'd* 323 S.C. 409, 475 S.E.2d 762

(1996). These fundamental principles were echoed by the Supreme Court in *Abbeville County. See Abbeville County,* 335 S.C. at 69, 515 S.E.2d at 541 ("We do not intend by this opinion to suggest to any party that we will usurp the authority of that branch to determine the way in which educational opportunities are delivered to the children of our State. We do not intend the Courts of this State to become super-legislatures or super school boards.") *Thus, this case is not about what the Court thinks is best for education in South Carolina or the Court's view as to the best way to deliver educational services to students in South Carolina.* Nor is the issue how the Plaintiff Districts are treated or perform compared to other districts in the State.... The question presented is absolute not comparative.... This case is not a forum about what ought to be or what policy choices the Court would make if it were authorized to do so. Accordingly, this Court must decide this case not in terms of whether the Court believes that one policy is superior and another is wanting, but rather based on whether the system of education policies enacted by the General Assembly sufficiently provides the opportunity for students to acquire a minimally adequate education.

(emphasis added). Courts additionally lack the institutional capacity to address and resolve such policy matters. While the General Assembly possesses plenary power to "provide for the maintenance and support of a system of free public schools open to all children in the state," S.C. Const. art. XI, § 3, "[c]ourts, however, are different. The necessary restrictions on our jurisdiction and authority contained in ... the Constitution limit the judiciary's institutional capacity to prescribe palliatives for societal ills." *Missouri v. Jenkins,* 515 U.S. 70, 112, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (O'Connor, J., concurring).

Courts, as "the weakest of the three departments of power," are limited to resolving cases and controversies and pronouncing a legal judgment. *The Federalist No. 78,* at 576 (Alexander Hamilton) (John Hamilton ed., 1866). That is accomplished through a trial governed by procedural and evidentiary rules. For example, evidentiary rules binding on courts are not designed to permit flexible consideration of all

of the types of information necessary to inform legislative public policy decisions.

In addition, for appellate purposes, the settled record of the trial court proceeding is reviewed for legal error. This long-standing rule is ignored today. As I will describe more fully below, the Court makes no pretense of reviewing a settled record of a trial court proceeding, but relies heavily on post-trial data (through internet searches and otherwise) and then refers to its post-trial findings as evidence.

At the heart of this matter is the constitutional separation of powers, a principle the majority acknowledges is "sacrosanct," yet ignores in application. What constitutes a minimally adequate education is fundamentally a policy determination to be made by the people, through their elected representatives. It is neither appropriate nor functional for the judiciary to be the arbiters of the adequacy or inadequacy of the state's public education system. The *Abbeville I* standard, as well-intentioned as it may be, makes the General Assembly an-swerable to this Court for what is clearly a policy matter constitutionally committed exclusively to the Legislative Branch. Thus, I would overrule *Abbeville I*.

### III.

Judge Cooper dealt masterfully in attempting to put *Abbe-ville I* into a workable, objective framework, holding that "[a]s expressly held by [this Court], the *Abbeville County* standard is one of opportunity. This standard is materially different from the requirements of other states, which tend to focus more on achievement than opportunity." He further noted that "[p]erhaps the most important word in the *Abbeville County* opinion is 'opportunity' ... Opportunity connotes availability and occasion. It does not mean achievement or guaranteed success." This guidepost of opportunity, accord-ing to Judge Cooper, is best understood and analyzed through evaluating legislatively directed funding mandates, referred to as "inputs."

Judge Cooper recognized the General Assembly cannot legislate outcomes, deemed "outputs." He stated, "The edu-cation clause of the Constitution does not require the State to ensure that all students acquire a minimally adequate edu-

cation. However, it does require the State to provide 'each child' the opportunity to obtain a minimally adequate education."

After exhaustively reviewing the Plaintiff Districts' numerous allegations and the General Assembly's many statutes addressing education and education funding, Judge Cooper dismissed all but one of the Plaintiff Districts' claims because the General Assembly has, indeed, provided the opportunity for each child to receive a minimally adequate education. As to those issues, Judge Cooper's thorough decision should be affirmed. However, Judge Cooper *also* found that the General Assembly's failure to adequately fund early childhood intervention programs did not adequately counteract the effects of poverty on the very young and, therefore, did not satisfy the requirements of the Education Clause. It is my view that finding was an error of law and should be reversed.

Yet the majority rejects an objective framework in applying *Abbeville I*. Make no mistake about it, by mandating an "outputs" standard, the Court holds the General Assembly constitutionally responsible for socially desired outcomes. As much as I wish the General Assembly could eradicate poverty through legislation, it cannot. Today's result creates out of whole cloth an incalculable constitutional standard and makes the General Assembly answerable to this Court for what is clearly a policy matter constitutionally committed exclusively to the Legislative Branch. As noble as the Court's intentions may be, as judges, we are sworn to follow the law, not our hearts. For "law, without equity, though hard and disagreeable, is much more desirable for the public good than equity without law; which would make every judge a legislator, and introduce most infinite confusion, as there would then be almost as many different rules of action laid down in our courts as there are differences of capacity and sentiment in the human mind." 1 *William Blackstone, Commentaries* *62.

And finally, our limited and deferential standard of review further militates against today's improper exercise of judicial power. A constitutional claim is one at law, and we are (supposedly) constrained to uphold the trial court's findings of fact if supported by "any evidence." *In re Treatment & Care*

*of Luckabaugh,* 351 S.C. 122, 131, 568 S.E.2d 338, 342 (2002). The standard of review is ignored today.[33]

## A. Evolving Legislative Response and Ever–Increasing Funding

I am perplexed by the Court's approach to this appeal as if the legislative response to public education matters is static. Assuming the existence of a constitutional violation when this case was tried in 2004, the legislative landscape has changed dramatically in the intervening years with the passage of a myriad of education reforms. Since this lawsuit was filed, and even since the trial, public education funding has increased substantially. The following chart illustrates the state revenue allocated per pupil through much of this twenty-year litigation:

| | 1992–1993 Revenue Per Pupil | 2007–2008 Revenue Per Pupil | Percent Increase |
|---|---|---|---|
| Allendale | $4,820 | $6,847 | 42.1% |
| Dillon 2 | $4,052 | $5,548 | 30.8% |
| Florence 4 | $4,413 | $7,159 | 62.2% |
| Hampton 2 | $5,226 | $6,868 | 31.4% |
| Jasper | $4,446 | $5,613 | 26.2% |
| Lee | $4,293 | $6,843 | 59.4% |
| Marion 7 | $4,785 | $8,341 | 74.3% |
| Orangeburg 3 | $4,484 | $5,551 | 23.8% |

The following chart reflects state revenue per pupil in the Plaintiff Districts as contrasted with the state average:

---

**33.** The majority claims to "affirm as modified" the judgment of the trial court. This is not so, for the majority reverses the trial court on the primary constitutional claim in determining that, although each discrete aspect of the public school system may be constitutionally adequate, taken together, the challenged funding scheme is a "fractured formula denying students in the Plaintiff Districts the constitutionally required opportunity." Indeed, the trial court determined the State had provided the Plaintiff Districts with the constitutionally required minimally adequate education.

Yet the increasing funding commitment of the General Assembly does not reflect the total dollars devoted to public education from all sources-federal, state and local—as the chart below shows:

| | 2005–2006 Expenditures Per Pupil | 2010–2011 Expenditures Per Pupil | Percent Increase |
|---|---|---|---|
| Allendale | $11,956 | $12,543 | 4.9% |
| Dillon 2 | $7,258 | $8,532 | 17.6% |
| Florence 4 | $8,941 | $10,515 | 17.6% |
| Hampton 2 | $10,130 | $14,159 | 39.8% |
| Jasper | $8,242 | $10,351 | 25.6% |
| Lee | $9,173 | $9,657 | 5.2% |
| Marion 7 | $10,473 | $13,273 | 27.0% |
| Orangeburg 3 | $9,334 | $10,750 | 15.2% |

I further note that, with the exception of Dillon 2, each of these Plaintiff Districts spend more per pupil than the average state per pupil expenditure of $9,008,[34] and five of the eight districts in this litigation are in the top ten school districts in

---

**34.** Even this figure is not current as it represents the most current as of re-briefing by the parties in mid–2012.

the state in terms of revenues received. Thus, Plaintiff Districts are among the highest funded districts in the state, a fact that was true at trial.

Today's mandate to the General Assembly is to spend more, and the majority's protestations to the contrary ring hollow. The Court "hold[s] that South Carolina's educational funding scheme is a fractured formula denying students in the Plaintiff Districts the constitutionally required opportunity." This holding is made in the face of the General Assembly's long-standing "funding scheme" to allocate ever-increasing education funds *disproportionately* to the historically poorer counties.

The Court includes a section entitled "Poverty," in which it laments the regrettable and undeniable reality of poverty in the Plaintiff Districts. Let me be clear that I too regret the undeniable reality of poverty that the Plaintiff Districts face. The Court points to the General Assembly's Child Development Education Pilot Program (CDEPP) and suggests that the General Assembly does "not directly refute the claim by the Plaintiff Districts that CDEPP is inadequately funded to meet student needs." I believe the General Assembly does refute that claim. In any event, the point remains that the Court is directing the General Assembly to spend more money on education, as the Court ponders "how the Defendants can effectively utilize the [CDEPP] program *absent full funding* and implementation." (emphasis added).

The Court insists, and correctly so, that it is doing more than ordering the General Assembly to provide additional funding as the solution. Although we are not told precisely what the General Assembly must do to comply with today's mandate, it cannot be denied that increased funding must be part of the legislative response.

Just by way of example, the majority opinion states that "Plaintiff Districts argue, and we agree, that the proper question is whether the education funding apparatus as a whole gives rise to a constitutional violation." We are also told there is "a clear disconnect between spending and results." Moreover, the Court finds a Wyoming case to be "particularly illuminating" and quotes with approval a portion of that opinion, including the following: "Because education is

one of the state's most important functions, lack of financial resources will not be an acceptable reason for failure to provide the *best* educational system." *Campbell Cnty. Sch. Dist. v. State,* 907 P.2d 1238, 1279 (Wyo.1995) (emphasis added) ("All other financial considerations must yield until education is funded.").

Any reasonable reading of the Court's decision leads to the conclusion that the General Assembly's court-ordered restructuring of the public education system must include an increase in funding. In ordering a linear solution to a complex situation, the Court has fallen victim to the culturally prevailing view that merely throwing money at a problem becomes a comforting panacea. Moreover, the Plaintiff Districts refuse to define "full funding," for whatever the General Assembly appropriates, it will never be enough. As Judge Cooper intuitively understood, outcomes cannot be legislated, yet that is the matrix adopted by this Court.

Beyond the practical considerations, of which there are many, there is the rule of law and what I believe is the limited role of the Judicial Branch. As Alexander Hamilton famously wrote, "The legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated: The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever." *The Federalist No. 78,* at 575 (Alexander Hamilton) (John Hamilton ed., 1866). Today we have crossed the constitutional line into an area reserved exclusively to the Legislative Branch, the "purse."

If we must, we should evaluate this legal challenge based on the current legislative response. That, of course, will always be problematic in the constantly evolving area of public education finance and funding, which again reminds us why the courts should not run the South Carolina public school system. Prior to today, this Court has recognized many times before that such policy determinations are committed to the Legislature. *See Horry Cnty. Sch. Dist. v. Horry County,* 346 S.C. 621, 632, 552 S.E.2d 737, 743 (2001) ("The legislature has wide discretion in determining how to go about accomplishing its duty to provide for the maintenance and support of a system

of free public schools." (quotations and citations omitted)); *Richland County v. Campbell*, 294 S.C. 346, 349, 364 S.E.2d 470, 472 (1988) ("The development of our school system in South Carolina has demonstrated the wisdom of the framers of the Constitution in leaving the General Assembly free to meet changing conditions." (citations omitted)); *Washington v. Salisbury*, 279 S.C. 306, 308, 306 S.E.2d 600, 601 (1983) ("The plain language of [the Education Clause] places the responsibility for free public education with the General Assembly....."); *McElveen v. Stokes*, 240 S.C. 1, 10, 124 S.E.2d 592, 596 (1962) ("[T]he scope of the legislative power is much broader in dealing with school matters than is the scope in dealing with various other subjects.").

### B. Inputs versus Outputs

The Court reviews the General Assembly's many and laudable legislative efforts through the years to provide a meaningful educational opportunity for South Carolina's schoolchildren through the rubric of "inputs" and "outputs." Inputs is code for money, and outputs represents "test scores and graduation rates," i.e., outcomes. The Court admits the myriad statutory enactments, with formula funding favoring the Plaintiff Districts, "are indicative of a comprehensive education regime." We are further assured that the General Assembly has "seemingly addressed each of the important aspects of public school education, and provided the requisite funding for general education and additional programs," that the "inputs into each of the Plaintiff Districts appeared to fulfill the General Assembly's constitutional duty," that this "robust education scheme appears to be at work in the Plaintiff Districts," and that the "instrumentalities of learning—money, curriculum, teachers, and programs, are present and appear at the very least adequate."

We are thus presented with a robust and comprehensive legislative history, which "appear[s] to fulfill the General Assembly's constitutional duty." Those candid acknowledgments should be more than enough to affirm the trial court, but they are not. Without explanation, the Court finds that the constitutional responses of the General Assembly in the aggregate are somehow unconstitutional. This I do not understand. According to the majority, the outputs establish a

constitutional violation. The solution—more "inputs." I strongly disagree.

Even if I were to accept the Court's framework, I would conclude, as did the learned trial judge, that the Plaintiff Districts have failed to establish a constitutional violation. *See* *McDaniel v. Thomas*, 248 Ga. 632, 285 S.E.2d 156, 165 (1981) ("In the absence of evidence to show that existing state *funding* for public education deprives students in any particular school district of basic educational *opportunities*, [the] contention that low wealth districts fail to provide an 'adequate education' must be rejected." (emphasis added)). In measuring student performance, we are told the Plaintiff Districts have experienced "minimal and irregular gains." Regarding graduation rates, the Court acknowledges "improvement since trial," describing the progress as "significant gains" and "dramatic." Nevertheless, the Court discounts this noteworthy improvement, opting instead to refer to the Plaintiff Districts as "educational ghettos," where students are "unable to meet minimal benchmarks ... but are nonetheless pushed through the system to 'graduate.'" These are self-serving findings and illustrate the lengths to which the Court is willing to go to find a constitutional violation.

### C. Existence of the Opportunity, Judicial Intervention, and the Remedy

After finding a constitutional violation, the Court returns to "opportunity," as if it is opportunity after all that the Court is considering. I view this as an effort to take the focus off the Court's demand that the General Assembly spend more money.

To lend a judicial veneer to its opinion, the Court cites repeatedly to, and quotes extensively from, *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). *Brown*, however, has nothing to do with the supposed legal case before the Court. When the Complaint in *Abbeville I* was filed more than two decades ago, it included an equal protection claim. The equal protection claim was dismissed by the trial court and *this* Court. The Court cites the correct history, noting this Court reversed the *Abbeville I* trial court only with respect to the state's Education Clause. To this

Court, in briefing and re-briefing, the Plaintiff Districts have only referenced *Brown* briefly, and have only done so in a historical discussion of the importance of education, not as the standard for resolution of our constitution's Education Clause. Furthermore, the trial court, in its lengthy and detailed order, never once cited to *Brown* and was never petitioned for reconsideration of *Brown's* applicability. Despite its well-deserved iconic standing in American jurisprudence, *Brown* is not implicated in this case. Invoking *Brown* may make good theatre, but it has no relevancy here.[35]

As for the remedy, the Court relies heavily on case law from New York and Wyoming. The Court ultimately admits, as it must, that the cases from New York and Wyoming "present[ ] somewhat distinguishable constitutional standards from our own." The fact that South Carolina's Education Clause is different from its counterparts in the state constitutions of New York and Wyoming is not some mere aside. Judge Cooper discussed at length the varying state constitutional approaches in the country, observing that our standard of "opportunity . . . is materially different from the requirements of other states, which tend to focus more on achievement than opportunity." The majority's reliance on the New York and Wyoming models is understandable given the desire to force the General Assembly to spend more money, as the Court cites to the New York and Wyoming decisions as support for the finding "that our State's education system fails to provide school districts with the resources necessary to meet the minimally adequate standard."

---

35. *Brown* involved an equal protection challenge on the basis of race warranting strict constitutional scrutiny. The *Brown* decision was long overdue and brought an end to the constitutionally shameful and indefensible separate-but-equal doctrine of *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). Here, the dismissal of the Plaintiff Districts' equal protection claim (which was not asserted on the basis of race) was affirmed in *Abbeville I.* Moreover, the trial court on remand from *Abbeville I* specifically noted that the racial composition of the Plaintiff Districts and its alleged impact was not an issue before the court, a finding with which the Plaintiff Districts concur. Thus, the particular type of constitutional claim and suspect classification based on race found in Brown are not involved in this matter. *Brown* has no application. Even assuming *Brown* were applicable to the current challenge, Brown's enduring standard is one of opportunity, not outcomes.

## D. School District Size

I commend the majority for its willingness to confront the issue of school district size. Five of the Plaintiff Districts are in a county with multiple districts. Florence County has five school districts; Marion County has three school districts; Hampton County has two school districts; Orangeburg County has three school districts; and Dillon County has three school districts. Each school district has its own superintendent and array of administrative personnel and costs. The administrative redundancy is self-evident. These Plaintiff Districts ask this Court to order the General Assembly to spend more money, yet these school districts are unwilling for the sake of the children to forgo their power and consolidate districts so that more funds can be devoted to the students, teachers, and classroom instruction. As the majority correctly observes, the Plaintiff Districts "have opted for a course of self-preservation, placing all blame" on the General Assembly.

## E. Pre-school Early Childhood Programs

Concerning pre-school early childhood programs, the trial court found:

The child born to poverty whose cognitive abilities have largely been formed by the age of six in a setting largely devoid of printed word, the life blood of literacy, and other stabilizing influences necessary for normal development, is already behind, before he or she receives the first word of instruction in a formal educational setting.

As a personal observation, I agree with this finding. Yet the constitution and rule of law must be a judge's guidepost, not the judge's private feelings for a desired policy. I believe a court exceeds its proper and limited role when it elevates personal preferences to constitutional status. I similarly view the following finding of the trial court:

There is testimony from experts and educators alike that effective early childhood intervention, especially to children who are born into poverty, can make a difference in educational abilities and achievements ... [E]arly childhood intervention from prekindergarten to grade three has not received the priority needed to be an effective force in

minimizing the impact of poverty on educational abilities and achievement throughout the educational process.

Perhaps "early childhood intervention ... has not received the priority" it should. However, there is nothing in the text of our Education Clause mandating such programs. The Education Clause requires the General Assembly to provide a system of free public schools, not a system of free *pre-school* programs. I believe this language should be given its plain and ordinary meaning. *Fraternal Order of Police v. S.C. Dep't of Rev.*, 352 S.C. 420, 427–28, 574 S.E.2d 717, 721 (2002) (noting that when construing the State constitution, this Court applies rules similar to those relating to the construction of statutes, and the language of the constitution will be given its plain and ordinary meaning (citations omitted)).

The correct state of the law is that pre-school programs exist only by virtue of statute. We are thus presented with a statutory claim masquerading as a constitutional claim. I would adhere to *Abbeville I's* foreclosure of statutory claims. In any event, I observe that since the trial of this case, the General Assembly has increased education funding and added new pre-school education programs. For example, in 2007, the General Assembly created CDEPP as an additional early childhood education program, which continues to be funded.

Thus, I would reverse the trial court's judgment respecting pre-school programs, as I believe that judgment is controlled by an error of law.

## IV.

The notion of a "minimally adequate" qualitative standard is easy to agree with in the abstract. But as a legal concept, formulated by today's holding, it lacks a discernible foundation and objective framework. It is precisely this amorphous quality that bespeaks the nature of this issue as a political question.

In *Richland County v. Campbell,* this Court reaffirmed longstanding precedent recognizing the Legislature's broad discretion in public education:

The Constitution ... places very few restrictions on the powers of the General Assembly in the general field of

public education.... The development of our school system in South Carolina has demonstrated the wisdom of the framers of the Constitution in leaving the General Assembly free to meet changing conditions.

294 S.C. 346, 349, 364 S.E.2d 470, 472 (1988) (internal marks and citation omitted) (quoting *Moseley v. Welch,* 209 S.C. 19, 33–34, 39 S.E.2d 133, 140 (1946)).

In *Abbeville I,* also assigned to Judge Cooper, the trial judge in his order of September 20, 1996, observed:

Of those states whose education articles have been addressed by the courts, South Carolina's provision for "free public schools" is among those having no comment about the adequacy of education to be provided. After reviewing the case law from various jurisdictions, the reason for this omission is brilliantly simple: it is impossible for a constitution or court order to define or enunciate an adequate education which will stand for all time. In the absence of qualitative standards in the state constitution and because of education's placement in the broad discretion of the legislative branch, this court cannot rewrite the constitution to insert an adequacy standard so the court can then interpret its meaning.

(internal citations omitted). Judge Cooper was right then, as he is today.

I end where I began.

The fact that this lawsuit does not present a legal controversy in no manner detracts from the critical significance of public education to all South Carolinians. Public education is, of course, a matter of great importance to our State and its citizens. But characterizing an issue as a matter of public importance is not a license for the exercise of judicial power. Indeed, "it is not within the power or province of members of the Judiciary to advance their own personal wishes or to implement their own personal notions of fairness under the guise of constitutional interpretation." *Hornbeck v. Somerset Cnty. Bd. of Educ.,* 295 Md. 597, 458 A.2d 758, 790 (1983). "The quantity and quality of educational opportunities to be made available to the State's public school children is a determination committed to the legislature or to the people of

[this State] through adoption of an appropriate amendment to the State Constitution." *Id.*

I am reminded of the Women's Suffrage Movement of almost one hundred years ago. Notwithstanding the presence of the Equal Protection Clause, no one ran to an amenable federal judge to declare a new law. The law was changed as the Framers intended, through a constitutional amendment, and hence the Nineteenth Amendment was ratified in 1920.[36]

We live in a different era, where a disgruntled citizen can seek out a friendly court which shares the same values and then have those personal preferences judicially decreed into law. This Court has no history of this practice, and it is my hope today's decision is not a harbinger of things to come. I am especially troubled by the suggestion that today's decision "rest[s] solidly on this Court's precedent." It does not.

I also think it important to note that the impact of today's decision is not limited to the funding of public education, for this Court's order that resources be devoted in one area necessarily diminishes the range of the General Assembly's discretion in other areas. The General Assembly deals with many matters of great public interest, and it must make difficult decisions in allocating limited resources among a wide-ranging array of needs. Those needs include infrastructure, law enforcement, social services, the yet to be determined expanse and state liability of the Affordable Care Act, and the list goes on. Such funding decisions and priorities are complex and are a function of policy decisions and choices in the Legislative Branch, which demands comity and respect from the Judicial Branch. By boldly encroaching into the constitutional prerogative of the General Assembly in the funding and policy decisions regarding public education, the Court's overreach today has a corresponding negative impact on the General Assembly's ability to make policy and funding decisions in other areas.

The General Assembly must now respond, not to the people of South Carolina, but to this Court. This Court will decide whether the General Assembly's funding and policy decisions

---

**36.** "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex." U.S. Const. amend XIX.

align with the Court's preferences, notwithstanding the fact that where one of the political branches "possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable," and absent an infringement of an individual right, such political actions are not subject to judicial review. *Marbury*, 5 U.S. at 166.

Because this Court's policy-oriented review of our State's education system lies outside the scope of judicial review, I respectfully dissent.

PLEICONES, J., concurs.